ATCHISON, TOPEKA AND SANTA FE RAILWAY CO. et al., Appellants,

v.

AIRCOACH TRANSPORT ASSOCIATION, Inc., et al., Appellees.

BALTIMORE AND OHIO RAILROAD COMPANY et al., Appellants,

v.

AIRCOACH TRANSPORT ASSOCIATION, Inc., et al., Appellees.

PENNSYLVANIA RAILROAD COMPANY et al., Appellants,

v.

AIRCOACH TRANSPORT ASSOCIATION, Inc., et al., Appellees.

NEW YORK CENTRAL RAILROAD COMPANY, Appellant,

v.

AIRCOACH TRANSPORT ASSOCIATION, Inc., et al., Appellees.

Nos. 14053-14056.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 9, 1957.

Decided Feb. 25, 1958.

Mr. Douglas F. Smith, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Messrs. Richard J. Flynn, Amos M. Mathews, Joseph D. Feeney, Jr., Chicago, Ill., and John Bodner, Jr., Washington, D. C., were on the brief, for appellants in No. 14053, and Mr. Hugh B. Cox, with whom Mr. Paul F. McArdle, Washington, D. C., was on the brief, for appellants in No. 14055, argued for all appellants.

Messrs. William E. Miller, Stephen Ailes and Richard A. Whiting, Washington, D. C., were on the brief for appellants in No. 14054.

Mr. James C. McKay, Washington, D. C., also entered an appearance for appellants in No. 14055.

Mr. Edward K. Wheeler, Washington, D. C., was on the brief for appellants in No. 14056.

Mr. David I. Shapiro, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Gerhard P. Van Arkel, Washington, D. C., was on the brief, for appellees.

Before WILBUR K. MILLER, BAZELON and FAHY, Circuit Judges.

FAHY, Circuit Judge.

Plaintiffs in the District Court, appellees, hereinafter called Aircoach, are four supplemental air carriers and the Aircoach Transportation Association, Inc., to which they belong. They sued forty railroads and two unincorporated rate committees,[1] hereinafter jointly called the Railroads, appellants, for treble damages and a permanent injunction under the Clayton Antitrust Act,[2] alleging facts which would ordinarily constitute violations of sections 1 and 2 of the Sherman Antitrust Act[3] by reason of practices of the Railroads in connection with their charges for military traffic of the United States.

The case was decided by the District Court on cross motions for summary judgment, which were heard on the pleadings, exhibits and affidavits filed by the parties. The essential undisputed facts we think may be briefly summarized as follows:

During World War II and through 1948 the railroads handled some 97 per cent of the military passenger traffic. Beginning in 1949 buses and air carriers began to compete for this traffic. By 1954 the railroads' share dropped to 48 per cent and the nonscheduled air carriers received 34 per cent.

In 1953 the Railroads adopted two rate practices complained of in this action. One is the concerted quotation of "variable spot bids." Through a joint agent the Railroads bid for military traffic at variable rates which might drop to fifty per cent below their published commercial schedules. The joint agent acts not only for connecting but also for competing Railroads in offering the single price. The second practice is the making of "package bids," involving movements from a single starting point to a number of different destinations. The air carriers are unable to participate in portions of these movements because of the short distance involved, lack of airfield facilities, or size of the movement. The Railroads, through their joint agent, make "package bids" in which they agree to transport the military personnel in these movements on an "all or nothing" or "package" basis. The prorated bid of

1. Only twenty-nine railroads and one rate committee are appellants here.

2. 38 Stat. 731, 737 (1914), 15 U.S.C. §§ 15, 26 (1952), 15 U.S.C.A. §§ 15, 26.

3. 26 Stat. 209 (1890), as amended, 15 U.S.C. §§ 1, 2 (Supp. IV, 1957), 15 U.S.C.A. §§ 1, 2.

the Railroads might be higher than that of the air carriers on those portions of the movement where the latter are able to compete, but the Railroads receive the entire contract.

As the complaint alleges, since 1914 certain railroads have negotiated special rates with the military agencies of the Government for the transportation of personnel by overall contracts. The contract currently in effect, Joint Military Passenger Agreement No. 29, provides that the railroads shall deal through joint agents and shall give the military agencies a standard reduction of ten per cent below commercial rates. The Agreement also provides that the railroads may make through their joint agent "separate special arrangements * * * more advantageous to the Government."

■ The Railroads raised several defenses of law, which may be summarized: (1) that the quotations complained of were made pursuant to section 22 of the Interstate Commerce Act[4] and have been immunized from the operation of the antitrust laws by an agreement approved by the Interstate Commerce Commission pursuant to section 5a of that Act.[5] Section 22 provides that nothing in the Act "shall prevent the carriage * * * of property free or at reduced rates for the United States * * * or the transportation of persons for the United States Government free or at reduced rates." Section 5a(2) provides that any carrier subject to the Act, "party to an agreement between * * * two or more carriers relating to rates * * * may * * * apply to the [Interstate Commerce] Commission for approval of the agreement," and if such approval is forthcoming section 5a(9) relieves the parties thereto "from the operation of the antitrust laws with respect to the making * * * and * * * carrying out of such

agreement * * *." Further, the Railroads contend that agreements which the Commission had approved covered the challenged practices; (2) that the Interstate Commerce Commission has exclusive primary jurisdiction over the subject matter involved.

The District Court granted the motion of Aircoach for summary judgment, leaving open, however, the amount of damages, and holding that the antitrust immunity of section 5a does not apply to concerted section 22 quotations, that the Interstate Commerce Commission does not have exclusive primary jurisdiction, and that the concerted section 22 quotations complained of are illegal per se under the antitrust laws. The court permanently enjoined the Railroads from offering to the military agencies variable spot rate and package rate quotations arrived at in concert. The injunction was limited, however, so as not to apply to such concerted quotations for through transportation over a single route operated by two or more railroads. This court suspended the injunction pending the appeals. The several appeals, consolidated in this court, are from the same order of the District Court.

We first consider whether any reduced rates permitted by section 22 may be made the subject of an agreement which the Commission may approve under section 5a. If not, and if the challenged practices are illegal per se, the judgment of the District Court should be affirmed.

No entirely convincing answer to the first of these questions seems possible as of the time of the order of the District Court. Shortly thereafter, by an Act effective August 31, 1957, Pub.L. No. 85–246, 85th Cong., 1st Sess., 71 Stat. 564, Congress amended section 22 to make clear that thenceforth the provisions of paragraph (9) of section 5a, carrying relief from the antitrust laws, should apply to quotations or tenders of

---

4. 24 Stat. 387 (1887), as amended, 49 U.S.C. § 22 (1952), 49 U.S.C.A. § 22. The part of § 22 pertinent at this point is now § 22(1) as a result of the Act of August 31, 1957, Pub.L.No. 85–246, 85th

Cong., 1st Sess., 71 Stat. 564, discussed infra.

5. 62 Stat. 472 (1948), 49 U.S.C. § 5b (1952), 49 U.S.C.A. § 5b.

rates, fares, or charges made under section 22. The Amendment, however, explicitly provides that nothing in it "shall affect any liability or cause of action which may have accrued prior to" its effective date. We accordingly must decide this case without regard to the Amendment, unless it bears somehow on the meaning of the pre-existing terms of the Act. As to this, on the one hand it refers to "quotations or tenders of rates, fares or charges" for the transportation of property or persons free or at reduced rates, which the Amendment now for the first time requires to be in writing or to be confirmed in writing, with a copy submitted to the Commission by the carrier. Only upon submittal of a quotation or tender made pursuant to an agreement approved under section 5a shall paragraph (9) of that section apply, with consequent relief from the antitrust laws. On the other hand, the Amendment states that these provisions, presumably those of paragraph (9) of section 5a, "shall continue" to apply as to any such approved agreement under which any such quotation or tender was made prior to the Amendment. The several terms referred to would appear

to neutralize the Amendment insofar as it bears on this case. See note 14, infra.

The general scheme of the Interstate Commerce Act is that rates, fares, and charges shall be filed with the Commission [6] and shall not be changed when filed and published except upon thirty days notice to the Commission and to the public,[7] and, when schedules stating a new rate, fare, or charge are filed, that there is authority in the Commission either upon complaint or upon its own initiative to suspend the same.[8] These provisions illustrate the general plan for regulation and supervision of rates for public protection; and this plan is not applicable to the questioned section 22 practices used by the Railroads during the period here involved.[9] Aircoach accordingly urges that those practices are not rates which may be the subject of an agreement approved under section 5a, as Congress did not mean to exempt from the antitrust laws concerted action with respect to rates which are not subject to the regulation and supervision of the Commission.

Legislative history,[10] in addition to the general scheme of the Act, is cited to support this position.[11] Representative

---

6. 24 Stat. 381 (1887), as amended. 49 U.S.C. § 6(1) (1952), 49 U.S.C.A. § 6(1). Transportation generally is forbidden unless rates have been filed therefor. 34 Stat. 587 (1906), as amended, 49 U.S.C. § 6(7) (1952), 49 U.S.C.A. § 6(7).

7. 24 Stat. 381 (1887), as amended, 49 U.S.C. § 6(3) (1952), 49 U.S.C.A. § 6 (3).

8. 36 Stat. 552 (1910), as amended, 49 U.S.C. § 15(7) (1952), 49 U.S.C.A. § 15 (7).

9. See Southern Pac. Co. v. United States, 272 U.S. 445, 448, 47 S.Ct. 123, 71 L.Ed. 343; Southern Pac. Co. v. United States, 62 Ct.Cl. 391, 399–400; Illinois Cent. R. Co. v. United States, 58 Ct.Cl. 182, 184; Thompson v. Baltimore & O. R., D.C.E.D.Mo., 59 F.Supp. 21, 35–38, modified on other grounds, 8 Cir., 155 F.2d 767; United States v. Southern Pac. Co., 25 I.C.C. 255, 258. And see United States v. Union Pac. R., 28 I.C.C. 518, 524; In re Contracts for Free Transportation, 16 I.C.C. 246, 249.

10. The pertinent legislative history is that of the Bulwinkle-Reed Bill the enactment of which in 1948 brought section 5a into the law. The companion bills were S. 110 and H.R. 221, 80th Cong. (1947–48).

11. H.Conf.Rep. No. 2005, 80th Cong., 2d Sess. (1948); S.Rep. No. 44, 80th Cong., 1st Sess. 4, 13 (1947); H.R.Rep. No. 1100, 80th Cong., 1st Sess. 11–12 (1947); S.Rep. No. 1511, 79th Cong., 2d Sess. 36 (1946); 94 Cong.Rec. 5627–32, 5635, 5640–41, 6642, 6653, 6657, A–3926, A–4032–34 (1948); 93 Cong.Rec. 6592, 6595–96, 6701–05 (1947); 92 Cong.Rec. 10241, 10257, 10269–70 (1946); 91 Cong. Rec. 11749–50, 11755–56 (1945); Hearings, Senate Committee on Interstate and Foreign Commerce on H.R. 2536, 79th Cong., 2d Sess. 41–42, 70, 116–21, 158, 174, 228–29, 267, 1157 (1946); Hearings, Senate Committee on Interstate and Foreign Commerce on H.R. 2536, 79th Cong., 2d Sess. 9, 101, 1380 (1946); Hearings, Senate Committee on Interstate and Foreign Commerce on S. 942, 78th Cong., 1st Sess. 870–76, 878

Bulwinkle, in explaining the section 5a provisions, which took his name, indicated they would not permit two carriers to bypass the Commission in establishing rates; the carriers would still be required to file their rate proposals with the Commission, which was not so with respect to section 22 rates prior to the Amendment of August 31, 1957. The Commission was to retain power to determine whether or not the rate proposals should be placed in effect.[12] See statement of Senator Reed at 94 Cong. Rec. 6642 (1948); statement of Senator Myers, 94 Cong.Rec. 6657 (1948); statement of Representative Wolverton, 94 Cong.Rec. A-3926 (1948); and explanation of Representative Bulwinkle, 94 Cong.Rec. A-4032-34 (1948).[13] All these references support the view that concert in proposing rates under agreements approved by the Commission was to be permitted because the Commission could control the rates proposed; absent such control it would be inconsistent with the Congressional plan to exempt rate practices from the antitrust laws; and such inconsistency would occur with

respect to these spot and package bids reached in concert and offered to the military services as alleged in the complaint.[14]

Nevertheless, we think the general statutory scheme referred to does not necessitate a conclusion that no section 22 reduced rates may be concertedly offered under the authority of an agreement approved by the Commission under section 5a. Though not subject to the same regulation as commercial rates, all section 22 terms for governmental carriage are not, for that reason, altogether beyond concerted action permissible under section 5a. The Act is designed primarily for commercial traffic. Section 22 is apart from this primary design. It is a concession to the Government.[15] But the fact that section 22 reduced rates are not within the chief regulatory plan for commercial rates does not remove them from the Act entirely. The Commission itself has construed some of its regulatory power to apply to section 22 rates. Recently it held it had the power to require them to be filed, though it had not exercised the power. See statement

(1943); Hearings, House Committee on Interstate and Foreign Commerce on H.R. 221 and S. 110, 80th Cong., 1st Sess. 33–34, 83–84 (1947). See also H.Rep. No. 2633, 84th Cong., 2d Sess. 2 (1956); S.Rep. No. 1655, 83d Cong., 2d Sess. 4–5 (1954); S.Rep. No. 1683, 82d Cong., 2d Sess. 5 (1952); Hearings, Senate Interstate and Foreign Commerce Committee, on S. 377, S. 378, S. 937, S. 939 and S. 943, 85th Cong., 1st Sess. 39 (1957).

12. 94 Cong.Rec. 5629 (1948).

13. Representative Bulwinkle said that the Bulwinkle-Reed bill,
"does not give carriers the right to fix rates * * *. Under the bill the carriers have only the right they now have to propose rates to the ICC. The power to fix rates remains in the Interstate Commerce Commission. * * *
    *    *    *    *    *
"* * * The only actions of regulated carriers which are declared to be not subject to the antitrust laws are such actions as are themselves subject to complete regulations in the public interest by the Interstate Commerce Commission—a situation totally different from that applying to unregulated business.

"The purpose of the antitrust laws is to protect the public from price fixing at the hands of private business. But in the field of transportation this protection is already provided through Government price fixing by the Interstate Commerce Commission."
94 Cong.Rec. A–4032–33 (1948).

14. The fact that Congress in the 1957 Amendment found it necessary to bring § 22 rates within at least some supervision of the Commission when they explicitly stated that § 5a applies to § 22 rates lends support to this contention. Support can also be had from Representative Bulwinkle's statement that the reason a House amendment to the original Senate bill was adopted to limit the § 5a immunity provision to rates rather than extend it to matters of service to the public, as originally proposed, was that it was felt that agreements to curtail service would not be subject to ICC control and that immunity from "the restraint of the antitrust laws would leave this area of carrier activity covered by neither law." 94 Cong.Rec. A–4033 (1948).

15. Southern Pac. Co. v. United States, 62 Ct.Cl. 391, 399–400.

of the Commission in Ex parte 192, Reduced Rates Under Section 22, Special Filing Rule, 299 I.C.C. 417. Reparations have been awarded with respect to them when they have been found to be excessive, Police Jury of Caddo, La. v. St. Louis S. W. Ry., 78 I.C.C. 235. And there is no compelling reason why the power of the Commission to approve an agreed approach to terms of carriage should not extend to carriage for the Government at reduced rates. Reduced rates for transportation incident to our huge defense establishment should not, unless the Act clearly so requires, be left altogether beyond the reach of the Commission's power to approve agreements with respect to transportation. We find no statutory language, and no emanation from the statute as a whole, which requires this. We are fortified in this view by the fact that the Commission has heretofore approved agreements under section 5a containing references to section 22 rates. See, for example, Art. XV, § 1(j), Articles of Organization and Procedure of the Western Traffic Association, contained in ICC docket Section 5a Application No. 2; Art. II, § 13(d), Agreement of Eastern Railroads, contained in ICC docket Section 5a Application No. 3. 276 I.C.C. 183, 277 I.C.C. 279.[16] Furthermore, upon the basis of extensive testimony in committee hearings on section 5a, bearing on its possible application to section 22 "rate adjustment"[17] or reduced rates for war materials, the House and Senate Committee Reports pointed out that the evidence was convincing that the joint organizations maintained by the carriers were not only necessary to enable them to meet the commercial requirements of the nation but also were indispensable to the requirements of national defense. This appears to refer to testimony at the hearings urging continued protection for the railroads from the antitrust laws, as had existed under Certificate No. 44 of the War Production Board prior to the enactment of section 5a, so that the defense establishment could continue to obtain reduced rates under section 22. H.R.Rep. No. 1100, 80th Cong., 1st Sess., 11; S.Rep. No. 44, 80th Cong., 1st Sess. 12 (1947).

We resolve the ambiguous situation by holding as a matter of statutory construction that not all reduced rates under section 22 are necessarily to be excluded from concerted action under agreements approved by the Commission under section 5a, and therefore left unprotected from the operation of the antitrust laws under section 5a(9). The holding of the District Court to the contrary we think is error.

It does not follow, however, that the practices here involved may validly be included, or in fact are included, within any agreement which has been approved under section 5a.

The Railroads say that the Commission has decided that the practices have been validly permitted by agreements it has approved,[18] citing All American Airways, Inc. v. Abilene & Southern Ry., 297 I.C.C. 313. There certain air carriers complained to the Commission that practices like those now attacked were contrary to the national transportation policy, particularly the policy regarding unfair or destructive competitive practices and the national defense. The Commission dismissed the complaint, holding in the end that complainants showed no injury, in which circumstance

---

16. See also the following approved agreements, which in their full text can be found only in their respective dockets: Illinois Freight Ass'n—Agreement, Section 5a Application No. 21, 283 I.C.C. 17; Southern Freight Ass'n—Agreements, Section 5a Application No. 6, 283 I.C.C. 245; Southern Ports Foreign Freight Comm.—Agreement, Section 5a Application No. 19, 284 I.C.C. 775; Railroad Interterritorial Agreement, Section 5a Application No. 26, 287 I.C.C. 701. And see All American Airways, Inc. v. Abilene & Southern Ry., 297 I.C.C. 313, 316.

17. Hearings on H.R. 2536, House Committee on Interstate and Foreign Commerce, 79th Cong., 1st Sess., pp. 389-90 (1945).

18. The allegedly approved agreements referred to are those collected at note 16, supra.

it also held it could not say the procedures assailed constituted unfair or destructive competitive practices or contravened the national transportation policy. In the course of its decision, however, the Commission said the practices had been approved as the result of meetings of the passenger associations and committees "as provided in the section 5a agreements," that in arriving at the amount of reductions "in their special section 22 quotations to the military, the railroads apparently have followed strictly the procedures approved in the section 5a proceedings" which the complainants contended were not contemplated by the Congress in enacting section 22, nor by the Commission in approving agreements under section 5a.[19] The Commission also referred to the fear of complainants that it was the collusive intention of the Railroads to make future bids below out-of-pocket cost in order to destroy rather than to meet competition; in other words, "to drive the airlines out of business, and then restore their fares to their former level." "But," said the Commission, "this conclusion cannot properly be drawn from statements referred to nor from any of the other evidence presented." [20]

It is not clear to us that the Commission decided in Abilene that the practices were within section 5a in the contemplation either of Congress or of the Commission. That the Railroads used procedure approved by the Commission does not mean that practices thus arrived at were validly the subject of such procedure. Some types of section 22 reduced rates, such as a discount at a fixed percentage below commercial rates, might be within Act and agreement, yet a procedure validly applicable to the reaching of such a reduced rate, when used for these other practices, would not bring the latter within either Act or agreement. And we do not ourselves find any clear provision in any agreement which has been approved which applies to these practices. All agreements before us were approved by the Commission prior to 1953 when the competitive situation led the Railroads to initiate these practices.[21] Joint Military Passenger Agreement No. 29, the current contract between the military services and the Railroads, can be of little help. It is not a section 5a agreement approved by the Commission and, moreover, while it provides that the Railroads are free to make through their joint agent "separate special arrangements" more advantageous to the Government than the usual ten per cent reduction, it is by no means certain that a concerted plan for variable spot and package quotations is to be read into that provision. In any event the Commission has not dealt with the provision in that context.

■ The Railroads vigorously contend at this point that the question whether or not the practices can be or are covered by any section 5a agreement is within the exclusive primary jurisdiction of the Commission. They rely principally upon section 5a(7), here set forth in the margin.[22] We do not read

19. 297 I.C.C. at page 316.

20. Id. at page 318. Allegations of a similar nature, hereinafter referred to, are contained in the papers filed by Aircoach in the District Court in this case.

21. See agreements cited at note 16 supra.

22. "(7) The Commission is authorized, upon complaint or upon its own initiative without complaint, to investigate and determine whether any agreement previously approved by it under this section, or terms and conditions upon which such approval was granted, is not or are not in conformity with the standard set forth in paragraph (2), or whether any such terms and conditions are not necessary for purposes of conformity with such standard, and, after such investigation, the Commission shall by order terminate or modify its approval of such agreement if it finds such action necessary to insure conformity with such standard, and shall modify the terms and conditions upon which such approval was granted to the extent it finds necessary to insure conformity with such standard or to the extent to which it finds such terms and conditions not necessary to insure such conformity. The effective date of any order terminating or modifying approval, or

that provision as do the Railroads. It seems to us to authorize the Commission to determine whether an agreement which it has approved, or the terms and conditions of its approval, conforms with the standard set forth in paragraph 5a (2), or whether such terms and conditions are not necessary for that purpose, and to determine that either the approval, or the terms and conditions of the approval, should be modified to bring about conformity with such standard. The standard referred to is the "furtherance of the national transportation policy declared in this Act * * *," found at 49 U.S.C., preceding section 1, 49 U.S. C.A. note preceding section 1. The policy there declared, to be somewhat repetitious, is *inter alia* to encourage the establishment and maintenance of reasonable charges without "unfair or destructive competitive practices," all to the end of developing a national transportation system "to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." From this it appears that, should the challenged practices be thought by the Commission to be unfair or destructive competitive practices or otherwise inconsistent with the policy of the Act, section 5a(7) would militate against approval of any agreement authorizing them. This is quite different from saying that the practices when engaged in by the Railroads could have been or in fact were authorized by any approved agreement. Section 5a(7) is not in terms or, we think, in meaning a provision for the determination of either of those questions. Compare S. S. W., Inc., v. Air Transport Ass'n, 89 U.S.App. D.C. 273, 191 F.2d 658.

Aircoach, contending against the exclusive primary jurisdiction of the Commission, points to Petition of Household Goods Carriers Bureau, Inc., ICC Docket No. 32154, of May 9, 1957. There the Commission held that an issue as to immunity from the antitrust laws based on the provisions in section 5a(9), "with

respect to any particular action between carriers parties to such agreements, or by such parties with carriers not parties," is not within the jurisdiction of the Commission at all. It is not clear to us that the Commission meant to disclaim jurisdiction over any question of coverage whenever an antitrust charge is made. The Commission might have considered that even were a rate or practice covered there would remain the question whether it were validly covered and, therefore, protected by section 5a(9), and that this was a matter for the courts. Or the Commission might have had in mind that a practice which could validly be adopted in concert might nevertheless offend the antitrust laws when used as a weapon to destroy competition, and that this was for the courts. As Abilene is not in our view a definitive Commission decision that the practices here involved can be or are covered, so Household Goods is not a definitive decision against the Commission's capacity to determine those questions.

Nevertheless, the questions are appropriate for Commission consideration, even though, as we believe, exclusive primary jurisdiction over either of them does not reside in the Commission by reason of section 5a(7). Compare Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 48, 58 S.Ct. 459, 82 L.Ed. 638. The agreements relied upon by the Railroads had Commission approval. While the challenged practices arose subsequently to such approval, and seriously affect another industry, they arose nonetheless in the industry with respect to which the Commission has expertise and large responsibilities, and they are defended as authorized by the Commission's governing statute and by its administration thereof. In this situation, "the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue." Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 566, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318; Thompson v. Texas

modifying terms and conditions, shall be postponed for such period as the Commission determines to be reasonably necessary to avoid undue hardship."

Mexican Ry. Co., 328 U.S. 134, 151, 66 S.Ct. 937, 90 L.Ed. 1132. In each of these cases the Supreme Court directed the District Court to suspend its own decision pending opportunity for administrative action by the appropriate agency, and in Thompson the agency was the Interstate Commerce Commission. Cf. United States v. Western Pac. R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; Capital Transit Co. v. Safeway Trails, Inc., 92 U.S.App.D.C. 20, 201 F.2d 708.

In short, the court, while retaining jurisdiction, should in its discretion withhold decision on the interpretation of the statute and existing agreements approved under section 5a, insofar as the challenged practices are concerned, until the Commission has had an opportunity to decide initially whether in its view the Railroads can, with respect to those practices, be relieved of the operations of the antitrust laws under the statute and, if so, whether they have been so relieved by any approved agreement, and, if so, by which agreement or agreements, by what provisions thereof, and as of what date. The Commission might disclaim jurisdiction, or for some other reason might refrain from deciding these questions. We do not hold that it is required to decide them. The court could then proceed according to its own light to interpret either the statute or the agreements.

■ The foregoing assumes that the practices bring the Railroads into violation of the antitrust laws unless relieved of their operation by virtue of section 5a(9). The District Court held the practices to be illegal per se. We agree, unless they are so relieved.

The practices constitute a system of price-fixing in concert by competing, nonconnecting carriers. We are unable in law to distinguish such concerted fixing of charges and conditions for transportation from price-fixing of commodities, see State of Georgia v. Pennsylvania R., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051; cf. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, and we emphasize that the practices enjoined are not those of connecting carriers for through transportation, but those which result from concert between competing and nonconnecting carriers. These carriers agree among themselves, through their joint agent, on a charge within a certain range.[23] This is price-fixing among competitors and as such is illegal per se under the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700. To be illegal, prices need not be inflexibly set at any one point, but prices are fixed * * * if the range within which purchases or sales will be made is agreed upon * * *. They are fixed because they are agreed upon. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at page 222, 60 S.Ct. at page 843; see Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518.[24]

The Railroads contend that what occurs is price-cutting, which is not per se condemned by the antitrust laws, citing Schine Chain Theaters, Inc. v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245. There the cutting of prices was by a combination of ownership interests at theaters they owned or in which they had a financial interest; here the so-called price-cutting is agreed

23. The range does not permit a discount of more than 50% below the commercial rate.

24. The fact that section 22 provides that "nothing in this chapter shall prevent the * * * transportation of persons for the United States Government free or at reduced rates * * *" we think does not affect the question of concerted fixing of reduced rates among competitors. The permission granted to the carriers to transport for the Government free or at reduced rates is not a permission to competitors to agree upon a particular rate or a rate within a particular range.

upon between competitors. See 334 U.S. at pages 120–121, 68 S.Ct. at page 953, where the Court said there was "a bare finding that at times Schine [the group] cut admission prices," lacking the element that the practice "was in purpose or effect employed as an instrument of monopoly power."

The package bids, besides being bids at fixed prices, are accompanied by a condition that the Government must give certain specified traffic to the Railroads which otherwise might go to Aircoach. This condition is also illegal per se, for the Supreme Court has found per se illegality where one who has a monopoly in one place uses it to acquire exclusive privileges where he has competitors. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.[25]

■ One further substantive legal question must be considered. Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination or conspiracy to eliminate the competition of Aircoach, rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose of eliminating the competition of Aircoach for the section 22 transportation involved. See, by analogy, American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; State of Georgia v. Pennsylvania R., supra, 324 U.S. at page 458, 65 S.Ct. at page 726; Kobe Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, 422; Noerr Motor Freight, Inc. v. Eastern R. R. Pres. Conf., D.C. E.D.Pa., 155 F.Supp. 768, 814–816, 822–825; Parmelee Transp. Co. v. Keeshin,

D.C.N.D.Ill., 144 F.Supp. 480, 484; Noerr Motor Freight, Inc. v. Eastern R. R. Pres. Conf., D.C.E.D.Pa., 113 F. Supp. 737, 742–744; Slick Airways, Inc. v. American Airlines, Inc., D.C.D.N.J., 107 F.Supp. 199, 214, appeal dismissed sub nom. American Airlines, Inc. v. Forman, 3 Cir., 204 F.2d 230, certiorari denied 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336; United States v. Association of American Railroads, D.C.D.Neb., 4 F.R.D. 510, 526. In the District Court allegations and verified statements were made on behalf of Aircoach to the effect that the practices enjoined were in purpose employed by Railroads to eliminate the competition of Aircoach. Notwithstanding this, both Aircoach and Railroads moved for summary judgment. In the circumstances we construe each motion as a claim by the movant that it was entitled to judgment as matter of law on those facts which were undisputed. The motion of Railroads is not to be construed as admitting factual allegations in regard to a purpose to destroy competition which would have the legal result of removing Railroads from any possible protection from the antitrust laws; nor can Aircoach's motion be construed as abandoning those allegations. Thus, on this aspect of the case, there remains a factual dispute. Moreover, this aspect of the case need not be submitted for consideration or initial decision by the Commission as to either questions of fact or of law.

There thus arises a matter of procedure. As to this, a discretion must be left to the District Court after hearing the parties. It might be considered preferable, if Aircoach desires to pursue the assertions regarding a purpose to destroy competition, that this branch of the case should be the subject of a hearing, limited to that problem. Should Aircoach prevail Railroads would be liable in damages, and an appropriate injunction also could be granted. Or proceedings in the District Court on this subject could await

25. If the quantity of traffic were material we think there could be no doubt that it is so substantial, and the Railroad's control of it so great, that the antitrust decisions referred to have application.

reference to the Commission of the questions of coverage by statute or approved agreement.

We will dissolve the injunction at this time. We think this follows from a proper temporary balancing of competing considerations. Should it be held ultimately that there are violations of the antitrust laws the Railroads can be made to respond in damages and the propriety of an injunction can be reconsidered. We realize that there is no entirely satisfactory solution to the problem of an injunction at this stage of the litigation, but on the whole the one we adopt is perhaps better for the time being. Since we have stayed the injunction pending the appeals, the stay will be ended, being replaced now by dissolution of the injunction itself.

The judgment of the District Court will be vacated and cause remanded for further proceedings not inconsistent with this opinion.

It is so ordered.