CHAMPAIGN–URBANA NEWS AGEN-
CY, INC., a corporation, Plaintiff,

v.

J. L. CUMMINS NEWS COMPANY, INC.,
a corporation, Martin R. Hoffman, Sec-
retary of the United States Army, and
John L. McLucas, Secretary of the Unit-
ed States Air Force, Defendants.

No. 76–2–167.

United States District Court,
C. D. Illinois.

Sept. 26, 1979.

James L. Capel, Jr., Meyer, Capel, Hirsch-feld, Muncy, Jahn & Aldeen, Champaign, Ill., Alan E. Popkin and Pat L. Simons, St. Louis, Mo., for plaintiff.

Ralph J. Swanson, Sebat, Swanson, Banks, Lessen & Garman, Danville, Ill., for defendant Cummins.

V. Rock Grundman, Jr., and Charles G. Symmonds, Terry Horn, Peoria, Ill., for defendants Hoffman and McLucas.

## MEMORANDUM AND ORDER

BAKER, District Judge.

This is an action for damages under the Robinson-Patman Act. The plaintiff seeks to impose liability upon the individual defendants, who are governmental officials, and upon the private corporate defendant which dealt with them. The defendants have moved to dismiss or for summary judgment.

The plaintiff, Champaign-Urbana News Agency, Inc., is a Delaware corporation with its principal office and place of business in Champaign County, Illinois. Plaintiff is engaged in the business of wholesale distribution of paperback books, magazines and comic books in the States of Illinois and Indiana.

The defendant, J. L. Cummins News Company (Cummins), is an Illinois corporation with its principal place of business in Bloomington, Indiana. It is engaged in the same business as plaintiff and conducts a portion of that business within the Central District of Illinois.

The defendants, Martin R. Hoffman and John L. McLucas, are, respectively, Secretary of the United States Army and Secretary of the United States Air Force. In those capacities they are responsible for the administration and operation of the Army and Air Force Exchange Service (AAFES). AAFES is a nonappropriated fund instrumentality of the United States Government which operates post exchanges or commissaries located on Army and Air Force bases. The post exchanges sell a wide variety of merchandise, including paperback books, magazines and comic books, to members and employees of the United States Armed Forces and their families.

The plaintiff has filed its first amended complaint in three counts, seeking damages and injunctive relief. In Count I, plaintiff alleges that the defendant Cummins violated the Robinson-Patman Act, § 2(a), 15 U.S.C. § 13(a) (1976), by discriminating in the price of its goods between different purchasers and by affording a five percent discount to the Chanute Air Force Base Exchange in Rantoul, Illinois. As a result of Cummins' illegal price discrimination, the plaintiff claims that it has been injured and that it failed to receive the contract for sale of paperback books, magazines and comic books to the Chanute Air Force Base Exchange for the year 1976–1977. The plaintiff prays for damages against Cummins in the sum of $90,000 and for an injunction against the alleged illegal discriminatory sale practices.

In Count II, the plaintiff seeks a declaratory judgment against the defendants, Hoffman and McLucas, declaring that sales to the AAFES are subject to the provisions of the Robinson-Patman Act.

In Count III, the plaintiff alleges that the defendants, Hoffman and McLucas, in their capacities as Secretary of the Army and Air Force, respectively, combined and colluded with the defendant Cummins to procure a price discrimination in violation of § 2(f) of the Robinson-Patman Act to the plaintiff's injury. The plaintiff prays for damages of $90,000 from AAFES and that AAFES be enjoined from the practice of procuring a discrimination in price on purchases of paperback books, magazines and comic books.

The defendant, Cummins, and the defendants, Hoffman and McLucas, have separately moved to dismiss the first amended complaint with prejudice or for summary judgment on the grounds that the allegations show a lack of jurisdiction by the court over the subject matter and a lack of jurisdiction over the persons of the defendants, Hoffman and McLucas, and that the complaint fails to state a claim upon which relief can be granted.

The pleadings present the following issues for determination:

I. *Is AAFES, as an arm of the United States government, immune from liability under the Robinson-Patman Act?*

II. *If so, does this sovereign immunity extend to the defendant federal officials, Hoffman and McLucas?*

III. *If the federal buyers—AAFES, Hoffman and McLucas—cannot be liable for inducing a Robinson-Patman Act violation, does the private seller thereby escape liability?*

I. *Is AAFES, as an arm of the United States government, immune from liability under the Robinson-Patman Act?*

■ A. As a general rule, the United States may not be sued without its consent. 14 *C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure* § 3654, at 156 (1976). This doctrine of sovereign immunity has been imported to the United States from English law. *National Ass'n of Attorneys General, Sovereign Immunity: The Liability of Government and its Officials* (1975).

Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judi-

cial power is void. The failure of officials to seek review cannot give force to this exercise of judicial power. Public policy forbids the suit unless consent is given, as clearly as public policy makes jurisdiction exclusive by declaration of the legislative body.

*United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 514, 60 S.Ct. 653, 657, 84 L.Ed. 894 (1940).

The plaintiff claims *Penn Dairies, Inc. v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943), and *Paul v. United States*, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), support its claim that AAFES purchases are subject to the Robinson-Patman Act without express consent. The cited decisions do not support that proposition because they involve federal subjection to state regulation, which concerns conflicting sovereign rights and may in turn depend on land ownership.

In *Penn Dairies, supra*, the Supreme Court, recognizing that sales on government reservations were not subject to state regulation, held that Pennsylvania had a right to regulate the sale of milk at an Army camp established by the United States on land belonging to the Commonwealth of Pennsylvania. Only on an exclusively federal enclave would the Commonwealth of Pennsylvania have been prohibited from exercising control over the sale of milk.

Again, on the question of the ability of a state to regulate sales at military installations, the Supreme Court in *Paul* held that sales for government consumption could not be regulated irrespective of whether the consumption took place on a federal enclave or on state-controlled land. Whether a state could regulate the sale of goods which were not to be consumed by the federal government raised a different problem:

What we have said would dispose of the entire case but for the fact that some of the milk was purchased out of nonappropriated funds for use in military clubs and for resale at post exchanges. This brings us to the question whether Congress has power to exercise "exclusive legislation" over these enclaves within the meaning of Art. I. § 8, cl. 17, of the Constitution . . . .

371 U.S. at 263, 83 S.Ct. at 437. Whether the state had the right to regulate sales in the military clubs and post exchanges thus appeared to turn on the factual question of which sovereign owned the land on which the post was situated.

■ B. The weight of authority clearly indicates that AAFES is a branch of the Department of Defense and that its activities are protected by the doctrine of governmental immunity except in those specific instances where Congress has waived that immunity.

In *Standard Oil Co. v. Johnson*, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942), the Supreme Court was called upon to decide whether post exchanges, established under regulations promulgated by the Secretary of War under the authority of Congressional enactments, are arms of the government deemed by it essential for the performance of governmental function. The Court held that post exchanges are indeed arms of the government and that sales made in the post exchanges are exempt from state regulation.

Congressional recognition that the activities of post exchanges are governmental has been frequent. Since 1903, Congress has repeatedly made substantial appropriations to be expended under the direction of the Secretary of War for construction, equipment, and maintenance of suitable buildings for post exchanges.

. . . The object of the exchanges is to provide convenient and reliable sources where soldiers can obtain their ordinary needs at the lowest possible prices. Soldiers, their families, and civilians employed on military posts here and abroad can buy at exchanges. The Government assumes none of the financial obligations of the exchange. But government officers, under government regulations, handle and are responsible for all funds of the exchange which are obtained from the companies or detachments composing its membership. Profits, if any, do not

go to individuals. They are used to improve the soldiers' mess, to provide various types of recreation, and in general to add to the pleasure and comfort of the troops.

*Id.* at 484–485, 62 S.Ct. at 1170.

The conclusion in *Standard Oil Co. v. Johnson, supra,* that post exchanges and similar facilities are instrumentalities of the United States, is reiterated in *United States v. Mississippi Tax Comm'n,* 421 U.S. 599, 606, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975). That case, too, dealt with the ability of a state to tax a transaction on a post exchange and the Court recognized post exchanges as arms of the Department of Defense.

In *United States v. Hopkins,* 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976), the status of military post exchanges as arms of the Government was raised as a defense to an AAFES employee's suit for breach of employment contract. While the case turns on an interpretation of the Tucker Act, 28 U.S.C. § 1491 (1976), and the jurisdiction of the Court of Claims, the basic premise that AAFES is an arm of the Government remains unchanged.

It is noteworthy that Congress in defining government employees excluded AAFES personnel paid from nonappropriated funds but went on to say, "this subsection does not affect the status of these nonappropriated fund activities as Federal instrumentalities." 5 U.S.C. § 2105(c) (1976).

A series of lower court decisions have dealt with the status of AAFES as an arm of the government and the immunity which is attendant upon that status.

In *Ellsworth Bottling Co. v. United States,* 408 F.Supp. 280 (W.D.Okl.1975), a soft drink concessionaire claimed that AAFES had engaged in unlawful bidding procedure in awarding a contract to the plaintiff's competitor. The district court ruled that plaintiff had a remedy under the Administrative Procedure Act. In discussing AAFES status, the court said:

> The AAFES is a joint major command of the U.S. Army and the U.S. Air Force under the jurisdiction of the Chief of Staff, U.S. Army and Chief of Staff, U.S. Air Force. AAFES is the entity embracing the activities, personnel, property and nonappropriated funds through which exchange service is provided within the Army and Air Force. AR 60–10/AFR 147–7 §§ 1–5. The Secretary of Defense has vested in the Secretary of the Army and the Secretary of the Air Force all functions, powers and duties relating to exchange service activities within their respective departments. AR 60–10/AFR 147–7 §§ 1–3. Thus, it is clear that the AAFES is a part of the Department of Army and Air Force and, hence part of the Department of Defense. As AAFES is part of the Executive department, the Department of Defense, it cannot be an independent establishment within the meaning of 5 U.S.C. § 104. Moreover, in *Standard Oil Company of California v. Johnson, supra,* the Court found a post exchange, the predecessor to the modern AAFES, to be an integral part of the War Department, one of the predecessors to the Department of Defense, sharing in the duties intrusted to it and partaking of whatever immunities it may have under the Constitution and federal statutes.

*Id.* at 284 (footnote omitted).

*Ellsworth* also distinguishes *W. B. Fishburn Cleaners, Inc. v. Army & Air Force Exchange Service,* 374 F.Supp. 162 (N.D. Tex.1974), a case on which plaintiff relies. *Fishburn* found the AAFES to be an independent establishment within the definition of 5 U.S.C. § 104. *Ellsworth* points out, however, that *Fishburn* did not consider the effect of joint Army/Air Force regulations:

> In light of these regulations it is clear that the AAFES is a dependent part of the Departments of Army and Air Force. The AAFES is entirely under the control of these Departments. There is nothing independent about its operations under the pertinent regulations.

It is possible that the *Fishburn* court did consider the regulations but considered, in the construction of 5 U.S.C. § 104, that the words "or part thereof"

were intended to modify only "Government corporation" and not "Executive department, military department." This Court would reject such a construction. Reason dictates that if an Executive or military department is excluded from the section's coverage, an integral part thereof would also be excluded.

408 F.Supp. at 284 n.3.

*See also Bramblett v. Desobry,* 490 F.2d 405 (6th Cir. 1974), *cert. denied* 419 U.S. 872, 95 S.Ct. 133, 42 L.Ed.2d 111 (1974), which held the discharge of an AAFES employee by a base commanding officer was a governmental act granting immunity from suit; *Young v. United States,* 498 F.2d 1211 (5th Cir. 1974), where the plaintiff was barred from bringing suit in either the Court of Claims or the District Court and was required to seek relief under the Administrative Procedure Act; *Fraley v. United States,* 232 F.Supp. 491 (D.Mass. 1964), holding that AAFES was an instrumentality of the United States and not subject to suit for personal injuries arising from a collision with an automobile owned by AAFES; *Bailey v. United States,* 201 F.Supp. 604 (D.Alaska 1962), dismissing a suit brought on a post exchange contract because the United States had not waived sovereign immunity.

C. The examples cited by the plaintiff in its brief to illustrate the lack of governmental immunity for AAFES, *e. g.* federal legislation allowing imposition of state gasoline taxes, exempting AAFES from Civil Service control, the Tucker Act, and requiring liability insurance coverage for AAFES automobiles, tend rather to show a recognition by Congress of the governmental nature of AAFES functions. Each example is really an illustration of Congress saying, "In this particular instance we will waive the United States' immunity."

The rationale followed by the Court of Appeals for the District of Columbia in *Hecht v. Pro-Football, Inc.,* 144 U.S.App. D.C. 56, 444 F.2d 931 (D.C.Cir. 1971), in subjecting the District of Columbia Armory Board to suit under the antitrust laws, seems inapplicable to AAFES as an arm of the Department of Defense.

The *Hecht* decision leans heavily on cases interpreting the pre-emptive effect of government regulation on the application of antitrust laws to regulated industries. Thus, the Securities Exchange Commission in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), could not use its powers to bring about a business combination which would violate the antitrust laws. Similarly, the Comptroller of the Currency in his regulation of banks could not authorize a merger which violated the Clayton Act. *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Regulation by the Civil Aeronautics Board will not exempt airlines from application of the antitrust laws. *Pan American World Airways v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). Regulation by the Federal Communications Commission does not exempt broadcasters from the antitrust laws. *United States v. Radio Corporation of America,* 358 U.S. 334, 79 S.Ct. 457, 3 L.E.2d 354 (1959). Shipping subject to regulation by the Federal Maritime Commission, on the other hand, is exempt by statute. 46 U.S.C. § 814 (1976).

However, it does seem that AAFES is not analogous to any of the regulated industries subject to federal regulatory commissions which *Hecht* relied upon as being comparable to the District of Columbia Armory Board. As observed above, AAFES is an arm of the Defense Department and is government in the sense that it enjoys and partakes of the immunity which that department unquestionably enjoys.

Neither can it be said that *Hecht's* observations about state-created instrumentalities which are subject to antitrust legislation are persuasive that AAFES is a similar instrumentality. AAFES is not a federal agency with a status equivalent to the District of Columbia Armory Board. Rather, AAFES enjoys a higher and more protected status for purposes of sovereign immunity than does any District of Columbia agency. AAFES is truly a federal agency, while for purposes of sovereign immunity

the District of Columbia Armory Board is more like a state agency or instrumentality.[1] The antitrust laws are an exercise of Congress's commerce power and are thus supreme over any state law, including doctrines of state sovereign immunity. Although Congress may decide to exempt various activities of state government from coverage under the antitrust laws, nothing prevents Congress if it so desires from subjecting states to antitrust liability without their consent. *Georgia v. Evans,* 316 U.S. 159, 162, 62 S.Ct. 972, 86 L.Ed. 1346 (1942). The relevant question is not the power of Congress to create state—or District of Columbia—antitrust liability without the consent of those governments, but whether Congress in a particular case intended to do so. *Parker v. Brown,* 317 U.S. 341, 350–51, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *see Kurek v. Pleasure Driveway and Park District of Peoria,* 557 F.2d 580 (7th Cir. 1977), *vacated and remanded,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), for consideration in light of *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

■ The plaintiff argues that the nature of AAFES as a business enterprise requires that it be denied antitrust immunity. The plaintiff points out that AAFES operates on nonappropriated funds and engages in merchandising not unlike that of a chain of huge, private, supermarkets or department stores. In reality, plaintiff says, AAFES is not carrying out a governmental function but is engaged in a proprietary activity and should be subject to antitrust liability like the defendants in *Kurek, supra.* This argument mistakenly equates the status of AAFES immunity with state immunity. The "private business" test for determining whether state activity is within the coverage of the antitrust laws has relevance only in deciding whether Congress has intended the antitrust laws to override state sover-

eign immunity. As has been shown, however, AAFES enjoys federal, not state, sovereign immunity and cases like *Kurek* are inapposite.

While the plaintiff's argument that AAFES in reality is a business enterprise is a very appealing one philosophically, this court cannot ignore the reiterated holdings of the Supreme Court that AAFES is an arm of the Department of Defense and is government.

II. *Does the sovereign immunity of AAFES extend to the defendant federal officials, Hoffman and McLucas?*

■ A governmental officer acting within the scope of his authority in the discharge of the duties of his office enjoys the same personal immunity from suit as does the government.

In *Union Carbide and Carbon Corporation v. Nisley,* 300 F.2d 561, 576–77 (10th Cir. 1961) *cert. denied* 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962), the United States entered into a contract with one of the litigants for production of vanadium ore, which contract was claimed to violate the antitrust laws. The question of immunity of the government agent was raised:

The trial court was requested to instruct the jury in substance that the government itself could not violate the antitrust laws; that an agent for the government, acting within the scope of his authority, was likewise immune, and that if the authorized activities of the agent were validly conferred, the fact that the agent may have had illegal private motives in the performance of his authorized duty was irrelevant. It is true, as appellants suggest, that the antitrust laws are inapplicable to government activities. And, it may also be taken as equally true that since the government acts only through its agents, such agents are likewise immune from liability under the statute

1. The activities of the AAFES find their genesis in an exercise of enumerated federal powers under the Constitution; namely, the war and military powers of Art. I, § 7, clauses 11–14, together with the Necessary and Proper Clause. With regard to the District of Columbia, how-

ever, Congress is not limited to enumerated powers. It has, instead, the general police powers of a state government. *U.S. Const.* art. I, § 7, cl. 17; *National Mutual Insurance Co. v. Tidewater Transfer Co., Inc.,* 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949).

while acting within the scope of his authority in the furtherance of a declared governmental policy or legislative scheme. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; *Asheville Tobacco Board of Trade v. F. T. C.,* 4 Cir., 263 F.2d 502, Cf. *Atchison, Topeka & S. F. Ry. Co. v. Aircoach Transportation Ass'n,* 102 U.S.App.D.C. 355, 253 F.2d 877. But there is nothing in this agency contract to justify the inference that the government intended to transgress the antitrust laws. The contract does not purport to authorize USV to fix prices, restrain trade or achieve a monopoly in the vanadium industry, and we will not lightly infer an intention to do so. *Cf. Maryland and Virginia Milk Producers Ass'n v. United States,* 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880; *United States v. Radio Corp. of America,* 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354; *United States v. Borden Co.,* 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

If the AAFES activities are government functions and the Secretaries are in charge of those activities, it becomes apparent that the Secretaries are immune.

■ The argument that the Secretaries have waived governmental immunity is untenable. The executive arms of the government, through which the United States does business, have no power to waive the sovereign's immunity, or create a right of suit that Congress has not sanctioned. *American Foreign Steamship Corp. v. United States,* 291 F.2d 598 (2d Cir. 1961) *cert. denied,* 368 U.S. 895, 82 S.Ct. 171, 7 L.Ed.2d 92 (1961). *See also Reid v. United States,* 211 U.S. 529, 29 S.Ct. 171, 53 L.Ed. 313 (1909).

III. *If the federal buyers—AAFES, Hoffman and McLucas—cannot be liable for inducing a Robinson-Patman violation, can the private seller, Cummins, thereby escape liability?*

Section 2(a) and (f) of the Robinson-Patman Act states that:

It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers . . . where the effect of such discrimination may be substantially to lessen competition . . . .

. . .

. . . It shall be unlawful for any person engaged in commerce . . . knowingly to induce or receive a discrimination in price which is prohibited by this section.

■ On the face of the statute it is apparent that the seller and the buyer who engage in outlawed pricing activities are each subject to penalty and that the prohibitions of the statute can be applied individually as well as jointly. There is no necessity for concert of action by the seller and buyer to justify proceeding against the seller, although the statute does require the buyer to be witting before an action will lie against him. The different sections of the statute are independent of each other and may be separately enforced. *Federal Trade Comm'n. v. Henry Broch & Co.,* 363 U.S. 166, 170–71, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960).[2]

Cummins, the seller, argues it cannot be guilty of discrimination because its buyer cannot be guilty of inducement. It presents a theory of what might be characterized as "vicarious sovereign immunity." Taking the statute at face value, Cummins' claim would fail. If Congress intended to prohibit *all* price discrimination through the Robinson-Patman Act, then a seller should not find shelter behind the sovereign immunity of a buyer and frustrate the Congressional intent. To reach that conclusion, however, it would be necessary to find that Congress intended the Robinson-Patman Act to apply to all transactions, including those of the United States.

To resolve the question of Cummins' liability, therefore, it becomes necessary to go

2. It seems apparent from the statutory language that a buyer cannot be guilty of inducing if the seller cannot be guilty of discriminating, and the Supreme Court has so held. *Great*

*Atlantic & Pacific Tea Co., Inc. v. Federal Trade Comm'n,* 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979). *A&P,* however, says nothing about the reverse case which is the situation here.

beyond the initial inquiry of sovereign immunity and to probe the reasons for Congress' enactment of the Robinson-Patman Act. Did Congress intend that the Robinson-Patman Act should apply to purchases by the United States? Put another way, can the United States be a "purchaser" within the meaning of § 2(a) of the Robinson-Patman Act, *supra.*

 By its own terms, the Act does not prohibit all price discrimination. It expressly exempts "purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit." 15 U.S.C. § 13c (1976). The purpose of this exemption is to allow the named institutions to make their purchases at the lowest possible price. *Logan Lanes, Inc. v. Brunswick Corp.,* 378 F.2d 212 (9th Cir. 1967). The exemption runs to both sellers and purchasers.

> For every purchase . . . there must be both a purchaser and a seller. It follows that if a particular purchase is exempt from the Act, both the seller and the purchaser involved in that transaction are exempt. Moreover, the benefits in the form of lower prices which are expected to accrue to non-profit institutions by reason of this statute would be illusory if only the purchasing institution, but not the sellers thereto, were exempted. No seller would be able to give a non-profit institution the benefit of a lower price which was discriminatory under the Act,

if such a seller was not exempt from the sanctions of the Act in making the sale. *Id.* at 215–16.

 Why then was the government not exempted, the plaintiff argues, if the Act was not to apply to government purchases? The answer is straightforward and simple. The government was never included and therefore did not need to be exempted. It is an "old and well known rule that statutes which in general terms divest pre-existing rights or privileges will not [be applied] to the sovereign without express words to that effect." *United States v. United Mine Workers of America,* 330 U.S. 258, 272, 67 S.Ct. 677, 686, 91 L.Ed. 884 (1947).

*See Dollar Savings Bank v. United States,* 86 U.S. (19 Wall.) 227, 22 L.Ed. 80 (1874) where it was stated:

> It is a familiar principle that the King is not bound by any act of Parliament unless he be named therein by special and particular words. The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him in the least, if they may tend to restrain or diminish any of his rights and interests. He may even take the benefit of any particular act, though not named. The rule thus settled respecting the British Crown is equally applicable to this government, and it has been applied frequently in the different States, and practically in the Federal courts.

*Id.* at 239.[3]

---

**3.** The doctrine that the sovereign retains immunity from suit unless expressly waived and the rule of construction that restrictive statutes do not apply to the sovereign unless expressly named obviously overlap to a great extent. The distinctions emerge where, as here, the action somehow depends on the legal rights of the United States, and the amenability of the sovereign to suit is not at issue.

For example, in the *United Mine Workers* case, the validity of a federal court injunction against a labor strike depended on whether the Norris-LaGuardia Act covered the labor dispute. If it did, the anti-injunction provisions of that Act would have deprived the court of jurisdiction to issue the injunction. The strike occurred while the federal government had taken

over operation of the mines pursuant to a Presidential declaration of national emergency. The Supreme Court recognized that the Norris-LaGuardia Act, with its anti-injunction provision, would apply if the operation of the mines had remained in private hands. But because the Act covered only "employees" and "employers" generally, the Court held that the government was not an "employer" for purposes of the Act, and the Act did not apply.

The United States Supreme Court has applied the presumption in other cases to allow the United States to pursue a common-law collection remedy prohibited by statute to other creditors, *Dollar Savings Bank v. United States,* 86 U.S. (19 Wall.) 227, 238–39, 22 L.Ed. 80 (1869); to allow the United States to collect a

The United States Attorney General, shortly after passage of the Robinson-Patman Act, relied on this principle and construed the Act as not applying to government purchases. 38 *Op. Att'y Gen.* 539 (1936).

A district court following the Attorney General held the Act inapplicable to government purchases. In *General Shale Products Corp. v. Struck Construction Co.,* 37 F.Supp. 598 (W.D.Ky.1941), *aff'd on other grounds,* 132 F.2d 425 (6th Cir. 1942), the district court noted that Congress must have been fully aware of the Attorney General's construction of the Act when it debated and enacted the § 13c exemption provisions, yet it chose specifically not to include government purchases in the Act. No less an authority than U.S. Representative Wright Patman, a sponsor of the Act, seems to have acquiesced in the Attorney General's opinion:

> *Question* : If a manufacturer sells to government, municipal or public institutions at a lower price than he sells to his wholesale customers, is he in violation of the law if he does not make the same price for the same quantity available to the wholesaler to whom he sells?

> *Opinion* : The Attorney General of the United States has ruled that the Act does not apply to the government . . . . It may be presumed that the Attorney General's reasons may also be applied to municipal and public institutions.

*W. Patman, The Robinson-Patman Act: What You Can and Cannot Do Under This Law* 168 (1939). For a more recent statement by Mr. Patman to the same effect, see, *W. Patman, Complete Guide to the Robinson-Patman Act* 30 (1963). Similar sentiments are expressed in *E. Kintner, A Robinson-Patman Primer* 202–03 (1970).

On at least three occasions unsuccessful bills designed to amend the Robinson-Patman Act by bringing government purchases within its coverage have been introduced into the Congress. A bill introduced by Representative Patman in 1951 would have amended the Act by adding a new subsection (g), reading, "That for purposes of this section the term 'purchaser' includes the United States, any State or any political subdivision thereof." H.R. 4452, 82d Cong., 1st Sess. (1951). Two bills directly on point in this dispute, introduced by Representative Keogh, would have added the following new paragraph at the end of § 2(a) of the Act:

> For the purposes of this subsection, when any officer or agency of the United States (including those operating on nonappropriated funds) purchases commodities for resale, such officer or agency shall be deemed to be a purchaser of commodities to which this subsection refers, and such purchases shall be deemed to be in commerce.

H.R. 155, 86th Cong., 1st Sess. (1959); H.R. 430, 87th Cong., 1st Sess. (1961). The fact that Congress refused to pass them is persuasive evidence that Congress did not intend the Robinson-Patman Act to cover government purchases and specifically not AAFES purchases.

■ Any construction of the Robinson-Patman Act must take into account the fundamental difference between this Act and other antitrust statutes. Although classified as an antitrust law, the Robinson-Patman Act often works at cross purposes with other antitrust laws, particularly with the Sherman Act.

The Sherman Act prohibits monopolization and its economic equivalent, concerted activity by ostensible competitors. These

debt that would have been discharged in bankruptcy had it been owed to a private party, *United States v. Herron,* 87 U.S. (20 Wall.) 251, 263, 22 L.Ed. 275 (1873); to allow the United States to collect a partnership debt against a bankrupt out of the bankrupt's individual estate, even though the United States had not proved its claim in bankruptcy and even though private creditors would have been limited to the partnership estate, *Lewis v. United States,* 92 U.S. 618, 622, 23 L.Ed. 513 (1875); and to allow the United States to bring a criminal indictment under a statute prohibiting the importation of alien labor, when the statute spoke of enforcement only by forfeiture and penalty, *United States v. Stevenson,* 215 U.S. 190, 197, 30 S.Ct. 35, 54 L.Ed. 153 (1909).

practices allow individuals or collusive groups to insulate themselves from market forces and thereby to maximize profits by artificially lowering output and raising prices. *E. Gellhorn, Antitrust Law and Economics in a Nutshell* 87–98, 160–67 (1976). The Sherman Act protects competition, the theoretical heart of the free enterprise system. The Robinson-Patman Act, on the other hand, does not embody such a fundamental and generalized ideal to nearly the same extent. Congress passed the Act in 1936 "in response to the problem perceived in the increased market power and coercive practices of chain stores and other big buyers that threatened the existence of small independent retailers." *Great Atlantic & Pacific Tea Co., Inc. v. Federal Trade Comm'n*, 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979). *See also Federal Trade Comm. v. Henry Broch & Co.*, 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). To a great extent, the Robinson-Patman Act constitutes special-interest legislation designed to protect small businesses "from the rigors of more efficient, large scale, integrated chains." *L. Sullivan, Antitrust* 678 (1977). The Act, in many respects, is an antitrust aberration.[4]

Courts must be sensitive to the unique nature of the Robinson-Patman Act and attempt to construe it consistently, when possible, with "broader policies of the antitrust laws." *Great Atlantic & Pacific Tea Co., Inc. v. Federal Trade Comm'n*, supra, at n.13. This directive by the Supreme Court is supported by commentators:

To the extent that Robinson-Patman separates out for attack competitively harmful discrimination, it can be a positive instrument which aids antitrust enforcement; to the extent it may reach competitively neutral discriminations, its impingement on market freedom cannot be justified on antitrust grounds but only on other social grounds, if at all; furthermore, by limiting competitive choices, it begins to impinge on the interests protected by antitrust. To the extent that Robinson-Patman inhibits discriminations which are actually beneficial to competition, it collides with antitrust policy. As we shall see, the vigorous criticism so often lodged against the law is that it is not effectively integrated with antitrust and probably does more harm than good to competition. Moreover, it is often asserted that it does this harm without discernibly advancing any other comparably important social goal.

*L. Sullivan, Antitrust* 681–82 (1977).

In practice the Act has proved to be less than satisfactory. It has been applied primarily against those small sellers who were coerced into granting discounts or into competing against larger sellers, on the one hand, and against firms engaging in vigorous competition, on the other. As a consequence the Robinson-Patman Act has been roundly criticized as being anticompetitive and contrary to the general purposes of the antitrust laws. It has been attacked for discouraging price competition and promoting price uniformity. Consequently its significance in antitrust enforcement has faded in recent years.

*E. Gellhorn, supra, at 363–64.*

Given the essentially anticompetitive nature of the Robinson-Patman Act, it would appear that the broader policies of antitrust are better served by interpreting the Act narrowly rather than broadly. *Cf. Great Atlantic & Pacific Tea Co., Inc. v. Federal Trade Comm'n, supra.*

The Sherman Act and Clayton Act cases plaintiff cites to urge a broad application of the antitrust laws are therefore inapposite here. Congress did not intend the Robinson-Patman Act to apply to government purchases, and a seller who price discriminates in favor of the United States cannot be liable under the Act. The plaintiff cannot employ the Robinson-Pat-

**4.** The Act has been applied to terminate vigorous competitive activity, even when that activity was succeeding in breaking the probable monopolistic market share of an "injured" plaintiff. *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967).

**292**

man Act to defeat the United States in its attempts to secure the lowest price possible for goods sold in its military exchanges. Clearly that was not a result intended by the Congress.

IT IS THEREFORE ORDERED that the motions to dismiss of the defendants, Martin R. Hoffman and John L. McLucas, be, and hereby are, allowed. Counts II and III of the first amended complaint are dismissed with prejudice.

IT IS FURTHER ORDERED that the motion to dismiss (which was denominated motion for summary judgment) of the defendant, J. L. Cummins News Co., Inc., be, and hereby is, allowed. Count I of the first amended complaint is dismissed with prejudice.