Lloyd VEST, et al., Plaintiffs,

v.

George O. WARING, M.D., et al., Defendants.

Civ. A. No. C82–325A.

United States District Court, N.D. Georgia, Atlanta Division.

May 31, 1983.

Robert N. Meals, Jr., Meals & Parks, Atlanta, Ga., for plaintiffs.

Mesirov, Gelman, Jaffe & Cramer, David Creskoff, Philadelphia, Pa., for Dr. Laibson.

Nina Loree Hunt, Asst. U.S. Atty., Atlanta, Ga., for Ronald G. Geller, M.D., Carl Kupfer, M.D., National Eye Inst., Edward D. Norton, M.D. and Aran Safir, M.D.

Baker & Hostetler, Phillip A. Proger, Washington, D.C., for Roger Langston, M.D.

Hansell, Post, Brandon & Dorsey, Trammell E. Vickery, Kent E. Mast, Atlanta, Ga., for Stephen Obstbaum, M.D.

Phelps, Dunbar, Marks, Claverie & Sims, Rutledge C. Clement, Jr., New Orleans, La., for Dr. Safir and Dr. Kaufman.

Freeman & Hawkins, A. Timothy Jones, Atlanta, Ga., for Richard Thoft, M.D.

James J. Costello, University Counsel, University of Illinois, Urbana, Ill., for Joel Sugar, M.D.

Trotter, Bondurant, Miller & Hishon, Emmet J. Bondurant, Atlanta, Ga., Musick, Peeler & Garrett, Bruce A. Bevan, Jr., Los Angeles, Cal., for Schanzlin, Smith, Villasenor and Salz, M.D.

King & Spalding, A. Felton Jenkins, Jr., Atlanta, Ga., for Drs. Waring, Cavanagh and Wilson.

Nixon, Hargrave, Devans & Doyle, Robert C. Bernius, Rochester, N.Y., for James Aquavella, M.D.

Swift, Currie, McGhee & Hiers, James B. Hiers, Jr., Porter, Morris, Arthur, Atlanta, Ga., for Dr. Richard H. Keates.

Long, Weinberg, Ansley & Wheeler, Sidney F. Wheeler, Atlanta, Ga., for Drs. Waring, Cavanagh and Wilson.

Powell, Goldstein, Frazer & Murphy, E.A. Simpson, Jr., Atlanta, Ga., Dorsey & Whitney, James H. O'Hagan, James B. Lynch, Minneapolis, Minn., for Drs. Schoch, Bettman, McPherson, Reinecke, Newell, Spivey and Wilson.

Kilpatrick & Cody, Miles J. Alexander, Atlanta, Ga., for Edward D. Norton and Henry Gelender, M.D.

Mershon, Sawyer, Johnston, Dunwody & Cole, Felice K. Schonfeld, Miami, Fla., for Norton and Gelender.

Simmons, Perrine, Albright & Ellwood, Lawrence E. Blades, Cedar Rapids, Iowa, for Jay Krachmer, M.D. and Frederick Block, M.D.

Fellers, Snider, Blankenship, Bailey & Tippens, Burck Bailey, Oklahoma City, Okl., for Balyeat and Rowsey.

Leonard, Street & Deinard, Stephen J. Davidson, Minneapolis, Minn., for Richard L. Lindstrom, M.D. and Donald J. Doughman, M.D.

Perry Rosen, Atty., Civil Div., Dept. of Justice, Washington, D.C., for U.S.

Woodrow W. Vaughan, Jr., Atlanta, Ga., for Dr. Binder.

Robert S. Frank, Jr., Thomas F. Maffei, Lee T. Gesmer, Choate, Hall & Stewart, Boston, Mass., for Baum.

William J. Dunaj, Mershon, Sawyer, Johnston, Dunwoody & Cole, Miami, Fla., for Gelender, M.D.

Paul Terrence Dee, General Counsel, University of Miami, Coral Gables, Fla., for U. of Miami.

## OPINION AND ORDER

ROBERT H. HALL, District Judge.

### ORDER

This lawsuit, filed on February 19, 1982, involves a surgical procedure known as radial keratotomy that is performed on the cornea of the eye in an attempt to correct nearsightedness. The gravamen of the complaint, predicated on Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1,

2,[1] is that the defendants have conspired to restrict the ability of private ophthalmic surgeons to provide this surgery to willing patients, by creating, in effect, a monopoly group with pervasive control over the performance of the procedure. The defendants have responded to this charge by raising defenses based upon a form of "governmental immunity," lack of personal jurisdiction, and improper venue.

*Factual Background*

Dr. Leo Bores, one of the plaintiffs in this action, is the individual responsible for introducing radial keratotomy in this country. In 1976, Dr. Bores visited the Soviet Union and performed several radial keratotomies on human patients under the supervision of Dr. Svyatoslav Fyodorov, the Russian physician who developed the basic operative technique in use today. In 1977, Dr. Bores returned to Moscow and examined the six patients he had operated on the previous year. He then returned to the United States and performed the first radial keratotomy in this country in 1978. Subsequently, in November 1979, Dr. Bores joined forces with seven other eye surgeons to form the National Radial Keratotomy Study Group. ("NRKSG"). This group developed a basic scientific protocol for others to follow when performing the procedure,

and created a detailed informed consent form to be reviewed with each patient prior to the operation. (Bores Affidavit ¶¶ 2, 3, 4, 9, 10). Throughout this time, as Dr. Bores was aware, all forms of "refractive keratoplasty," including radial keratotomy, were considered by the National Advisory Eye Council[2] to be "experimental," and clinical procedures involving human patients were discouraged until the results of animal experiments employing the technique were available.[3] (Bores Affidavit ¶ 6).

In early March 1980, Dr. George O. Waring of the Emory University Clinic in Atlanta, Georgia, a defendant in this case, joined the NRKSG at the invitation of Dr. Bores, and attended an organizational meeting with thirty other physicians in Santa Fe, New Mexico. A few weeks later, on March 15, 1980, Dr. Waring, assisted by defendants Jay Krachmer of the University of Iowa and Dr. J. James Rowsey of the University of Oklahoma, convened a meeting at Hartsfield International Airport. Approximately fourteen eye surgeons from across the country attended this meeting[4], to discuss radial keratotomy and the possibility of obtaining a government grant in order to study the procedure in greater

**1.** The plaintiffs have also invoked this court's pendent jurisdiction over claims for tortious interference with contractual relations pursuant to Ga.Code Ann. §§ 105–1207 and 105–1401.

**2.** The National Advisory Eye Council was established by the Secretary of Health & Human Services pursuant to 42 U.S.C. §§ 289f and 289j, to "advise, consult with, and make recommendations to him on matters relating to the National Eye Institute." 42 U.S.C. § 289j(a). The National Eye Institute conducts and supports "research for new treatment and cures and training relating to blinding eye diseases and visual disorders, including research and training in the special health problems and requirements of the blind and in the basic and clinical sciences relating to the mechanism of the visual function and preservation of sight..." 42 U.S.C. § 289i.

**3.** The formal opinion of the National Advisory Eye Council on the status of "refractive keratoplasty" was apparently first published for the benefit of the ophthalmological community in the August 1979 edition of *Investigative*

*Ophthalmology & Visual Science. See,* Exhibit C to the "PERK" defendants' Motion for Summary Judgment.

**4.** Those attending were: Dr. James Aquavella, Rochester, New York; Dr. Perry S. Binder, San Diego, California; Dr. John D. Cowden, Detroit, Michigan; Dr. Henry Gelender, Miami, Florida; Dr. Richard H. Keates, Columbus, Ohio; Dr. Jay H. Krachmer, Iowa City, Iowa; Dr. Roger H.S. Langston, Cleveland, Ohio; Dr. Stephen A. Obstbaum, New York, New York; Dr. S. James Rowsey, Oklahoma City, Oklahoma; Dr. Richard Smith, Albany, New York; Dr. Joel Sugar, Chicago, Illinois; Dr. Richard A. Thoft, Boston, Massachusetts; Dr. George O. Waring, III, Atlanta, Georgia; and Dr. Louis A. Wilson, Jr., Atlanta, Georgia. Drs. Binder and Langston, originally named as defendants in this action, have been voluntarily dismissed by the plaintiffs. Drs. Cowden and Smith apparently were never named as defendants. The remaining participants in this meeting are currently defendants in this lawsuit.

depth.[5] Following this meeting, Dr. Waring contacted defendant Dr. Ronald Geller, Ph.D., the Associate Director of the National Eye Institute and also the Executive Secretary of the National Advisory Eye Council. Dr. Waring expressed his group's interest in performing some sort of collaborative study of radial keratotomy, and Dr. Geller indicated that the National Eye Institute was very interested in supporting such a study. Over the next several weeks, Dr. Waring began work on a rough draft of a protocol for this study, outlining in detail all procedures involved in the study, from patient selection through final data evaluation.

In May 1980, during the meeting of the Association for Research in Vision and Ophthalmology held in Orlando, Florida, Dr. Waring met with the same basic group present at the Atlanta meeting and Dr. Geller; this group agreed that a grant proposal for a radial keratotomy study should be submitted to the National Eye Institute, and divided among themselves various responsibilities for preparing the common protocol.

Shortly after this meeting, on May 28, 1980, the National Advisory Eye Council issued a statement indicating that "the Council considers radial keratotomy to be an experimental procedure because it has not yet been subjected to adequate scientific evaluation in animals or humans." [6] The resolution also urged the NEI to "take whatever measures are necessary to encourage research on radial keratotomy ... in scientifically designed clinical trials conducted by qualified investigators." It is this resolution and its purported ramifications throughout the extended ophthalmological community, in conjunction with the publication and dissemination of the conclu-

5. The conclusions from this meeting were published in the August 1980 edition of the *Archives of Ophthalmology;* the crux of the group's position on radial keratotomy at that time was that "caution must be exercised to prevent the proliferation of this operation before its efficacy and safety are established by careful studies in this country." *See,* Exhibit F, PERK Defendants' Motion for Summary Judgment. Earlier in the year, on March 15, 1980, Dr. Bores had issued a press release officially announcing the formation of the National Radial Keratotomy Study Group, and expressing "cautious optimism" about the use of the procedure as a "viable treatment for nearsightedness."

6. The full text of this resolution is as follows:

1. As the principal advisory body to the National Eye Institute, the federal government's chief source of support for vision research, the National Advisory Eye Council would like to express grave concern about potential widespread adoption of an operation intended to correct nearsightedness, a common condition that can be easily and safely corrected by the use of eyeglasses or contact lenses. The operation, called radial keratotomy, has received widespread publicity during the last year. It involves cutting the cornea with a series of deep incisions that extend from the sclera toward, but not into, the center of the cornea. The incisions are intended to be deep enough to weaken the tissue so that internal eye pressure causes the edge of the cornea to bulge slightly, thereby flattening the central portion of the cornea which improves focusing. The incisions result in permanent corneal scars.

2. The Council considers radial keratotomy to be an experimental procedure because it has not been subjected to adequate scientific evaluation in animals and humans. Recent reports of radial keratotomy from foreign countries and the United States provide an inadequate basis on which to assure the procedure's safety.

3. The Council calls for carefully controlled research on radial keratotomy to determine the effectiveness of the procedure, safety, long term and short term side effects, and the best surgical technique. The need for research on radial keratotomy and other forms of surgical correction of refractive errors (myopia, presbyopia, astigmatism) was recognized by the Council in a statement published in the journal "Investigative Ophthalmology and Visual Science" in August, 1979. Until the results of such research are obtained and fully evaluated by the ophthalmological community, the Council urges restraint on the part of both patients and eye surgeons.

4. The Council therefore urges that the National Eye Institute take whatever measures are necessary to encourage animal research on radial keratotomy while limiting clinical research to controlled clinical trials conducted by responsible investigators.

5. The Council strongly urges that its views on the subject of radial keratotomy as expressed in this resolution be announced to the general public, as well as to health care professionals.

sions from the March 1980 Atlanta Workshop, that the plaintiffs point to as compelling evidence of a pervasive nationwide conspiracy to restrain the performance of radial keratotomy.

On or about July 18, 1980, Dr. Waring and his group formally submitted their grant applications and proposed protocol to the National Eye Institute. Twelve University-affiliated clinical centers submitted separate grant proposals based on the common protocol that had been developed during the preceding three months. The grant request, entitled "The Prospective Evaluation of Radial Keratotomy" ("PERK"), later became known as the "PERK Study." During August and September 1980, the applications and protocol were reviewed in detail by the National Eye Institute's Ad Hoc Vision Program Committee. Following this review, the Institute awarded the first two grants to Emory University in Atlanta; Emory was to be both the principal clinical center as well as the coordinating center responsible for administrative matters and data compilation. After a series of meetings between the NEI and the remaining PERK applicants, during which final arrangements for the study and its protocol were made, the NEI made seven more clinical center grants on approximate-

ly February 1, 1981.[7] The final meeting between National Eye Institute employees and PERK representatives took place on April 27, 1981; approximately five NEI representatives, including defendant Dr. Carl Kupfer, Director of the National Eye Institute, attended this meeting to discuss the PERK Study.

While plans for the PERK Study were being developed by Dr. Waring and other ophthalmologists affiliated with the proposed clinical centers, certain allegedly related events were taking place in the private ophthalmological community. On May 1, 1980, the Georgia Ophthalmological Association, a private organization, passed a motion drafted by defendant Dr. H. Dwight Cavanagh. Dr. Cavanagh, an ophthalmic surgeon associated with Dr. Waring at Emory University, urged the Association to endorse the conclusions of the National Radial Keratotomy Workshop as they had been published in the *Archives of Ophthalmology*, (see n. 4 *supra* ) and requested that "each member of the Society in good standing . . . agree to refrain from participating in [radial keratotomy] surgery outside the framework of [the proposed PERK] study, for a period of one year, or until results indicate the technique is safe and effective."[8] Similar resolutions were subse-

---

7. The recipients of these grants were: Bascom Palmer Eye Institute (Miami, Florida); Louisiana State University Eye Center (New Orleans, Louisiana); University of Minnesota (Minneapolis, Minnesota); Mt. Sinai School of Medicine (New York, New York); University of Southern California (Los Angeles, California); University of Oklahoma McGee Eye Institute (Oklahoma City, Oklahoma); and the Wills Eye Hospital and Research Institute (Philadelphia, Pennsylvania). Doctors from all these institutions have been named as defendants in this lawsuit. In addition, on September 19, 1981, the NEI awarded a clinical center grant to the William Beaumont Eye Clinic in Detroit, Michigan, which had not been included in the original grant applications. No physician from the Beaumont Clinic has been named as a defendant in this case.

8. In its entirety, Dr. Cavanagh's motion read as follows:
Resolved:
1. That the Council of the Georgia Ophthalmological Society endorses the conclusions of the national radial keratotomy workshop,

2. that the Council recommends a study of radial keratotomy be established in Georgia at Emory and the Medical College of Georgia,
3. that guidelines for patient selection will be established in conjunction with the National Eye Institute and the national radial keratotomy workshop and submitted to the appropriate institutional review boards to safeguard human rights at each medical school for approval,
4. that following such approval, appropriate members of the practicing community will be invited to participate in the study with the academic centers, and approved by the Council,
5. that all patients will be selected by one physician, operated upon by another and followed by an independent ophthalmologist at each academic center,
6. that no physician will be remunerated for his participation,
7. that costs of the study will be borne by the respective medical schools,

quently passed by the New Mexico Ophthalmological Society;[9] the Florida Society of Ophthalmology on August 26, 1980;[10] and the Arizona Medical Association on May 21,

8. that results of the study will be reported to the Society at the Spring and Fall meetings of the Society,

9. and that when enough data has been generated locally and nationally to demonstrate the safety and efficacy of the technique, the Society will recommend to the state medical society, board of medical examiners and third party payers that it is an acceptable form of ophthalmic surgical practice. Until that time, the opposite will be recommended. Each member of the Society in good standing will agree to refrain from participating in such surgery outside the framework of this study, for a period of one year, or until results indicate the technique is safe and effective.

This resolution was also subsequently endorsed by the Medical Society of Georgia.

On November 22, 1980, John F. Bigger, the President of the Georgia Society of Ophthalmology, had the May resolution withdrawn. In its place was substituted this statement:

"On May 1, 1980, the Georgia Society of Ophthalmology adopted a resolution concerning radial keratotomy. The following statements reflect our current opinions and recommendations concerning this surgical procedure. (1) The Georgia Society of Ophthalmology supports and encourages the continued scientific investigation of radial keratotomy to determine its efficacy and safety. We support the continuation of those studies in progress at Emory University and the Metropolitan Eye Hospital. (2) We feel that until further data is generated under scientifically controlled conditions that radial keratotomy should be viewed as an investigational procedure, and recommend to our members that wish to do the procedure that they proceed under an investigational protocol with approval of the Institutional Review Committee at their local hospital facility."

9. The resolution passed by the New Mexico Ophthalmological Society reads as follows:

Resolved that:

1. The N.M.O.S. endorses the conclusions of the National Radial Keratotomy Workshop (NRKW) of March 15, 1980; and the National Advisory Eye Council (NAEC) Resolution approved May 29, 1980 concerning an operation called Radial Keratotomy.

2. The N.M.O.S. considers the procedure as "experimental", as does NAEC.

3. the Society recommends that a carefully controlled research study of radial keratotomy be established in New Mexico at the U.N.M. School of Medicine under the auspices of the Division of Ophthalmology, in accordance with the NRKW conclusions and NAEC Resolution.

4. guidelines for patient selection will be established in conjunction with the National Eye Institute and the National Radial Keratotomy Workshop protocol and will be submitted to the appropriate institutional review boards to safeguard human rights at the medical school for approval.

5. following such approval all licensed ophthalmologists in New Mexico will be invited to participate in the study with the academic center, if they so desire.

6. all patients will be selected by one physician, operated upon by another and followed by an independent ophthalmologist at the academic center.

7. no physician will be remunerated for his participation in the study by fees paid by the patient or third party insurers and payers.

8. results of the study will be reported to the Society at the interim and annual meetings of the Society.

9. when enough data have been generated both locally and nationally to demonstrate the safety and efficacy of the technique, the Society will recommend to the State Medical Society, the Board of Medical Examiners and third party insurers and payers, that it is an acceptable form of ophthalmic surgical practice. Until such time the opposite view will be held.

10. each member of the Society will agree to refrain from participating in such surgery outside the framework of this study, until results indicate the technique is safe and effective, which the Society anticipates will be no less than one year.

11. the members participating in the study as outlined should seek affiliation with and funding from the proposed Multicenter Participation Plan under the aegis of the National Radial Keratotomy Workshop and the National Eye Institute.

10. The resolution as originally passed by the Florida Society of Ophthalmology was nearly identical to the initial Georgia resolution. This first Florida resolution was, however, rescinded in September, 1980, and the following statement was substituted in its place:

The Florida Society of Ophthalmology Executive Committee on August 26, 1980, called for immediate research into radial keratotomy and urged caution on the part of patients and eye surgeons until current research can be reviewed and evaluated by the ophthalmological community. The Committee continues its call for caution concerning the radial keratotomy procedure, but wishes to clarify its previous statement.

The Committee recognizes that, in addition to the studies of radial keratotomy to be per-

1981.[11] The plaintiffs contend that these alleged attempts to exclude private ophthalmic surgeons from the PERK Study and hence from the market of ophthalmic surgeons available to perform radial keratotomy surgery constitute evidence of monopolization in violation of the antitrust laws.

The plaintiffs also complain of several other purported "side effects" arising from the establishment of the PERK Study team and the resultant restrictions on the performance of radial keratotomy. Several insurance companies have decided not to reimburse their insureds for radial keratoto-

formed at the three state medical centers in Florida, it would be in the public interest to allow qualified Florida ophthalmologists to participate in the investigation of the radial keratotomy procedure. Therefore, the Committee recommends that only qualified Florida physicians participate in the investigation of the radial keratotomy procedure.

The Committee specifically recommends that the procedure may be performed by any qualified Florida ophthalmologist who does the following:

1. Attends a recognized practical surgical course in radial keratotomy involving at least 8 to 16 hours of actual physical practice of the procedure, plus an indepth study of indications, contraindications, and complications. This course should be approved by a nationally recognized radial keratotomy study group.

2. On completion of the course described above, spends an observational period of time with a surgeon already experienced in the procedure, and gains expertise in follow-up examinations of patients who have had the procedure.

3. Participates in a nationally recognized study group as either a core or an adjunct member, and agrees to have his patients be part of an investigational protocol of such a study. (Such study groups may include Prospective Evaluation of Radial Keratotomy, Keratorefractive Society, National Keratotomy Study Group, etc.)

4. Submits formal written protocol with appropriate informed consent to the institutional review committee and/or human rights committee of the hospital or institution where the surgery is performed.

5. Reports formally and periodically his results to both his national sponsoring study group (as either a core or adjunct investigator) and to his hospital institution review committee where he is a member of the department of surgery.

Additionally, the investigator is encouraged to refer requests by the local media or other interested persons for information to his national study group for independent comment on the most current statistics and status of this study. This clarification of the radial keratotomy investigational procedure statement issued on September 10, 1980, is hereby recommended to the State Medical Society, Board of Medical

Examiners, Chiefs of Staff of all hospitals licensed in Florida, and third party payors.

11. The resolution passed by the Arizona Ophthalmological Society reads as follows:
RESOLVED, that,

1. The Arizona Ophthalmological Society (AOS), a group of physicians primarily concerned with eye care, expresses their concern about potential wide-spread adoption of an operation intended to correct nearsightedness, a common condition that can be easily and safely corrected by the use of eyeglasses or contact lenses.

2. The operation called Radial Keratotomy has received widespread publicity during the last two years. It involves cutting the cornea with a series of deep incisions that extend from the sclera toward, but not into, the center of the cornea. The incisions are intended to be deep enough so that internal eye pressure causes the edge of the cornea to bulge slightly, thereby flattening the central portion of the cornea which improves focusing. The incisions result in permanent scars.

3. The AOS considers Radial Keratotomy to be an "experimental" procedure because it has not been subjected to adequate scientific evaluation in animals and humans.

4. The AOS endorses the conclusions of the National Keratotomy Workshop of March 15, 1980; and the National Advisory Eye Council (NAEC) Resolution approved May 29, 1980, concerning Radial Keratotomy.

5. The AOS urges restraint on the part of both Arizona Ophthalmologists and patients regarding the procedure until results of research known as the Prospective Evaluation of Radial Keratotomy (PERK) study of the National Eye Institute (NEI) are obtained and fully evaluated.

6. The AOS urges that its views on the subject of Radial Keratotomy as expressed in this resolution be announced to the general public, other health care professionals, institutions, including institutional review committees, and third party insurers and payers in Arizona; therefore be it
RESOLVED,
That the Arizona Medical Association endorses and supports the resolution of the Arizona Ophthalmological Society concerning the procedure known as Radial Keratotomy until the safety and efficacy of the procedure have been carefully demonstrated in controlled studies.

my surgery because of its classification by the National Advisory Eye Council and various professional medical organizations as "experimental." In addition, several hospitals that do not allow "experimental" procedures to be performed in their operating rooms have rescinded operating privileges previously granted; as a result, some ophthalmic surgeons who would otherwise be able to perform radial keratotomy surgery have had to purchase the equipment necessary to enable them to perform the surgery in their offices. The plaintiffs argue that these facts, in combination with other evidence of alleged misconduct by the defendants, establish the defendant's illegal intent to monopolize the radial keratotomy market for themselves.

It is not appropriate, at this point in time, for this court to examine in tremendous detail evidence relevant to the merits of the case. The motions presently pending before this court all raise only preliminary issues involving immunity, personal jurisdiction and venue.[12] Before addressing the legal and factual questions presented by the instant motions, however, a brief description of the parties and their relationships to this case and among each other is in order.

There are four categories of persons represented by the named plaintiffs in this lawsuit.[13] Plaintiffs Marmer and Bores are physicians who were allegedly denied the opportunity to perform radial keratotomy surgery because of the defendants' actions. Plaintiffs Relyea and Clegg are patients who have severe myopia and who want to have radial keratotomy surgery performed; they have allegedly been "prevented" from obtaining the desired treatment due to their insurance carriers' refusal to provide coverage for "experimental" procedures. Plaintiffs Scott and Lyons are patients whose

ophthalmic problems were treatable by radial keratotomy and who did in fact have this surgery; now, however, their insurance carriers are either refusing to reimburse them for the operation or offering them only a nominal sum. Finally, plaintiffs Beck, Horsley and Vest had ophthalmic problems treatable by radial keratotomy, and did in fact obtain this treatment, but their access to it was purportedly substantially delayed as a result of the defendants' actions.

The "PERK defendants" who have filed the Joint Motion for Summary Judgment are all participants to some extent in the PERK Study. More specifically, Dr. George O. Waring III serves as Project Chairman of the study and activity participants in the overall conduct and administration of the study. He also performs radial keratotomy surgery on approved PERK patients in accordance with the PERK protocol. Defendant Drs. Henry Gelender, Richard Lindstrom, Stephen Obstbaum, Hal Balyeat, Richard Villasenor and James Salz are ophthalmic surgeons whose participation in the PERK Study involves actual performance of radial keratotomy surgery on PERK patients. Defendant Drs. H. Dwight Cavanagh, Louis Wilson, Donald Doughman, James Rowsey, David Schanzlin, Ronald Smith and Peter Laibson are ophthalmic surgeons who serve as Examiner-Investigators in the PERK Study and do not perform radial keratotomy surgery on PERK patients; their primary responsibilities include base-line evaluations and follow-up examinations of PERK patients, and supervision of data collection. Defendant Jay H. Krachmer is a Clinical Monitor for the PERK Study, and defendant Drs. Richard Thoft, Joel Sugar, James Aquavella and Jules L. Baum are Data and Safety Moni-

---

**12.** Specifically, this court is requested to rule on the following motions at this time: (1) Joint Motion for Summary Judgment by the "PERK" Defendants; (2) Motion to Dismiss or for Summary Judgment by the "Federal Defendants" Kupfer, Geller, Kaufman and Norton; (3) and Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue by Defendants McPherson, Bettman, Blodi, Newell, Reinecke, Schoch, Spivey, Fred Wilson, Balyeat, Rowsey, Villasenor, Schanzlin, Smith, Salz, Laibson,

Obstbaum, Gelender, Lindstrom, Doughman, Safir and Baum.

**13.** On May 20, 1982, the Plaintiffs filed their Motion to Maintain a Class Action. In accordance with the agreement among the parties, this court will reserve its ruling on this motion until all other preliminary matters have been resolved.

tors who make certain that the PERK protocol is strictly followed by PERK participants. Defendant Dr. Aran Safir was a participant in the PERK Study during its first few months; he has since resigned from this study. Finally, Dr. Richard Keates is affiliated with Ohio State University Medical School, which applied for, but did not receive, a PERK Study grant; thus Dr. Keates is not actually a member of the PERK Study group.

Defendant Drs. Edward Norton, Herbert Kaufman, Carl Kupfer and Ronald Geller, Ph.D. are collectively known as the "Federal Defendants." [14] Dr. Kupfer is the Director of the National Eye Institute and Chairman of the National Advisory Eye Council. Dr. Geller is the Associate Director of the National Eye Institute and the Executive Secretary of the National Eye Institute. Drs. Norton and Kaufman are university-affiliated ophthalmologists who are being sued individually and in their capacity as voting members of the National Eye Institute. None of these four defendants have ever performed radial keratotomy surgery.

Finally, defendant Drs. David Schoch, Jerome Bettman, Alice McPherson, Fred Wilson Sr., Robert Reinecke, Frank Newell, Frederick Blodi and Bruce Spivey are directors of the American Academy of Ophthalmology. These physicians, not involved in any way with the PERK Study, are being sued as a result of their endorsement, in June 1980, on behalf of the Academy, of the National Advisory Eye Council resolution labeling radial keratotomy an "experimental" procedure.

*Immunity from Antitrust Prosecution*

A. *The "Federal Defendants"—Kupfer, Geller, Kaufman and Norton*

The four "federal defendants" have been sued both in their individual capacities, and in their capacities as members of the National Advisory Eye Council which passed the May 28, 1980 resolution calling radial keratotomy an experimental procedure and urging restraint in its use.[15] This court is not persuaded by the plaintiffs' attempts to implicate these four defendants in the alleged conspiracy, and accordingly finds that all claims against them must be dismissed.

■ All parties appear to agree with the well-established principle that "[a] government officer acting within the scope of his authority in the discharge of the duties of his office enjoys the same personal immunity from suit as does the government." *Champaign-Urbana News Agency v. J.L. Cummins News Co.,* 479 F.Supp. 281, 287 (C.D.Ill.1979), *aff'd* 632 F.2d 680 (7th Cir. 1980). *See also, Sea-Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). In addition,

---

**14.** The National Eye Institute itself was originally named as a party defendant to this lawsuit, but was voluntarily dismissed with prejudice upon oral motion by the plaintiffs in open court on March 31, 1983.

**15.** Dr. Carl Kupfer is the Director of the National Eye Institute and Chairman of the National Advisory Eye Council. Dr. Ronald Geller is an Associate Director of the NEI and the Executive Secretary of the NAEC. Although both Dr. Kupfer and Dr. Geller participate in NAEC meetings, neither man has a vote on resolutions, motions, consideration of grant applications, or other matters acted on by the NAEC as a body. Both men are full-time NEI employees. *See,* Declarations of Dr. Kupfer and Dr. Geller.

Dr. Herbert Kaufman is a Professor of Ophthalmology and Pharmacology and Head of the Department of Ophthalmology at the Louisiana State University Medical Center in New Orleans. He was also a member of the NAEC from November 1, 1978 through October 31, 1982. Dr. Edward Norton is Professor and Chairman of the Department of Ophthalmology at the University of Miami School of Medicine and a member of the Board of Directors of the American Academy of Ophthalmology. He was also a member of the NAEC from March 3, 1978 through October 31, 1981. Both Dr. Kaufman and Dr. Norton participated in discussions relating to, and voted on, the May 28, 1980 resolution concerning radial keratotomy, as well as the earlier January 1979 resolution regarding refractive keratoplasty. Neither man participated in consideration, review or voting on any grant applications submitted in connection with the PERK Study, as both of their academic institutions had submitted grant applications for that study. *See,* Declarations of Dr. Kaufman and Dr. Norton.

the federal defendants are entitled to absolute immunity from suit against them in their individual capacities as long as their alleged wrongful acts were within the "outer perimeter of their federal employment." *Butz v. Economou,* 438 U.S. 478, 495, 98 S.Ct. 2894, 2905, 57 L.Ed.2d 895 (1978); *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).[16] The plaintiffs' primary contention with respect to the four federal defendants here is that their conduct in connection with the passage and publication of the May 28, 1980 NAEC resolution falls outside the "outer perimeter" of their federal employment.

■ The "outer perimeter" of a federal official's federal employment has traditionally been broadly construed:

The Supreme Court has declared that, with respect to immunity, "jurisdiction" [of a federal employee to act] ought to be defined broadly to include acts "having more or less a connection with the general matters committed by law to the official's supervision. *Spalding v. Vilas,* 161 U.S. 482, 498 [16 S.Ct. 631, 637, 40 L.Ed. 780] ... (1886). In other words, an act is within the official's jurisdiction if it is not "manifestly or palpably beyond his authority." *Id.*

*Simons v. Bellinger,* 643 F.2d 774 (D.C.Cir. 1980). *See also, Norton v. McShane,* 332 F.2d 855 (5th Cir.1964), *cert. denied* 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965). In light of these principles, it appears clear that the federal defendants acted within the scope of their authority as federal employees.

All four defendants are employees of the National Eye Institute, a federal entity created pursuant to 42 U.S.C. § 289i as an agency of the United States Department of Health and Human Services. In addition, all are members of the National Advisory Eye Council (*see* n. 2 *supra*), although Doctors Kupfer and Geller are non-voting members of this council and did not, in fact, vote on the controversial resolution. While the plaintiffs suggest that neither the NEI nor the NAEC has the authority to pass the resolution, and consequently that the individuals who participated in its passage did so outside the scope of their federal employment, a review of the statutory scheme within which the NEI and the NAEC were created indicates that precisely the opposite is true.

Through the NEI, the Secretary of Health and Human Services carries out his statutory mandate, relating to eye diseases and visual disorders, 42 U.S.C. § 289i, to

"conduct, ... encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man ... " 42 U.S.C. § 241(a).[17]

The National Advisory Eye Council is to "advise, consult with, and make recommendations to [the Secretary] on matters relating to the activities of the National Eye Institute." [18] It seems beyond dispute that the NAEC's formulation of the May 28, 1980 resolution, calling for "carefully controlled research on radial keratotomy" and expressing its opinion that "its views on the subject of radial keratotomy ... be an-

---

16. This immunity applies both to the plaintiffs' antitrust claims and to the common law tort claim of interference with contractual relations. *See, e.g., Evans v. Wright,* 582 F.2d 20 (5th Cir.1978).

17. 42 U.S.C. § 289k provides that "the Secretary shall, through the National Eye Institute established under this part, carry out the purposes of section 241 of this title with respect to the conduct and support of research with respect to blinding eye diseases and visual disor-

ders ... the Secretary may, through the Institute ... carry out a program of grants for public and nonprofit private vision research facilities."

18. 42 U.S.C. § 289j. Although the NAEC technically makes its recommendations to the Secretary, 42 U.S.C. § 289k provides that the Secretary shall act through the NEI; and thus recommendations of the NAEC go directly to the NEI.

nounced [by the Secretary] to the general public as well as to health care professionals" falls well within its duties as an advisory body.

The NAEC is certainly permitted, and indeed is encouraged, to identify fertile areas for vision research, such as radial keratotomy; that the NAEC should simultaneously "urge restraint" in the performance of a surgical procedure until the suggested research is completed should not, and does not, cast a "conspiratorial" pall over otherwise legitimate activity. Similarly, publication and dissemination of this resolution is consistent with the NAEC's statutory mandate. The resolution itself was discussed and passed at a regular meeting of the NAEC that was open to the public. Subsequently, Doctors Norton and Kaufman as NAEC officials *recommended* to the Secretary that the resolution be published; and the NEI was authorized to issue the press release only after clearance by the Department of Health and Human Services, the National Institutes of Health and the Public Health Service. The four federal defendants, then, as members of the NAEC, did nothing more than they are authorized to do—they played a part in the passage and subsequent publication of a statement affecting public health and safety. *See generally,* 42 U.S.C. § 241(a)(1). Even if, as the plaintiffs appear ultimately to contend, the NAEC resolution did have the effect of causing insurers to stop paying for radial keratotomy surgery, and state ophthalmological societies to declare a ban on such surgery, the act of passing the resolution was still clearly within the "outer perimeter" of the federal employment of the employees who passed it.

Absolute immunity is necessary so that "officials of government [can] be free to exercise their duties unembarrassed by the fear of damage suits in respect to acts done in the course of these duties." *Barr v. Matteo, supra,* 360 U.S. at 571, 79 S.Ct. at 1339. Since all of the allegedly wrongful acts of the federal defendants were within the outer perimeter of their federal employment,[19] they are entitled to absolute immunity and are accordingly dismissed from this lawsuit.

## B. *The PERK Defendants*

It has been suggested to this court that preservation of the federal interest in protecting the public health requires that absolute immunity also be given to those private individuals, such as the PERK defendants here, who undertake research projects funded by federal grants administered by the National Institutes of Health. The PERK defendants have asked this court to rule that mere participation by private physicians in a federally funded medical research study is not actionable under the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2; and accordingly to hold that these PERK participants, who allegedly did nothing more than act in strict compliance with the PERK protocol as approved by the National Eye Institute, should be dismissed from this lawsuit.[20]

---

**19.** The plaintiffs argue that Doctors Kaufman and Norton are not full-time "government officials" and that they are thus not entitled to any immunity. All of the alleged wrongful acts of Kaufman and Norton were, however, performed exclusively in the context of their capacity as members of the National Advisory Eye Council, a federal agency. 42 U.S.C. § 289j. The court is unaware of any authority that limits the availability of official immunity to full-time federal employees, and the plaintiff has cited no cases standing for this proposition. All purportedly improper action by Drs. Kaufman and Norton was undertaken by them as Special Employees of the United States government. *See,* Declarations of Defendants Kaufman and Norton; Federal Job Descriptions of

Defendants Kaufman and Norton. Surely the philosophical underpinnings of the doctrine immunizing federal official conduct would be severely damaged by the extreme position the plaintiffs suggest.

**20.** The bulk of the PERK defendants appear to argue that because they have done nothing but participate in the PERK study, and because such participation is itself allegedly immune from prosecution, this motion for summary judgment on the limited issue of immunity is in fact dispositive as to them on the merits. It has been conceded in open court, however, that at least as to defendants Waring, Cavanagh and Wilson, the PERK defendants' motion for summary judgment is in fact a motion for partial summary judgment on the issue of immuni-

■ The Sherman Act's prohibition on the making of agreements in restraint of trade is not applicable to the federal government in the exercise of its legitimate governmental functions. *Alabama Power Co. v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672, 675 (5th Cir.1968). The defendants premise their immunity argument upon the notion that they, and the PERK study, are "instrumentalities carrying out the National Eye Institute's research mission," and consequently that the immunity that attaches to the federal government and its agencies ought to shield them as well from the instant antitrust action. They maintain that research is the "core function" of the National Eye Institute, and that they are literally the hands and "arms" used by the NEI to fulfill its research obligations and goals.

It is true, as the defendants point out, that the NEI is authorized to "make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions ...," 42 U.S.C. § 241(a)(3), in order to encourage research on vision disorders. This court also does not dispute the assertions of both Dr. Kupfer and Dr. Geller that the "willingness and cooperation [of private physicians and scientists] to participate in federally funded activity is essential to the fulfillment of the research support mission of the [National] Eye Institute and the National Institute of Health." (Kupfer Affidavit ¶¶ 20, 23; Geller Affidavit ¶¶ 21, 24). Indeed, this court would agree that there is a national policy favoring the improvement of the public health, and encouraging research designed to effectuate that goal. It can just as easily be said, however, that there is a federal interest in the expansion of cultural awareness and artistry in the United States, and that the National Endowment for the Arts and National Public Radio are, at least in part, given federal financial assistance in order to turn this federal "interest" into a reality. Similarly, it can be argued that the national policy encouraging higher education in this country is given substance via the hundreds of federally subsidized or guaranteed scholarships, loans or work-study programs that currently exist at university campuses nationwide. And yet surely neither musicians and sculptors receiving a grant-in-aid from the National Endowment for the Arts, nor college students receiving a low-interest educational loan subsidized by the federal government, are absolutely immune from prosecution for all acts connected to conduct financially supported by this money. While in all probability the defendants would not in good faith suggest that this is the case, this court's acceptance of the PERK defendants' position on governmental immunity would be tantamount to insulating from liability any conduct underwritten to any extent by federal funds. This court finds such a result illogical and unconscionable.

■ A private agency, an organization, an individual or a group of persons can be federal "instrumentalities" only to the extent that there is a clearly expressed Congressional intent to create a "principal/agent" relationship between the government and these private parties. In other words, one cannot call himself an "instrumentality" or "arm" of the government merely because he believes himself to be, or even because he happens to be, fulfilling a legitimate governmental purpose. Rather, the extent to which a private entity can be deemed to be acting on behalf of or in the place of the federal government can be determined only by a careful examination of the relevant federal statutes and regulations, and the available legislative history.

The PERK defendants would have this court hold that the PERK study and its individual participants are "one of the agencies which the federal government uses in lieu of its own agency or facility to carry out a federal program," and that "in effectuating that program with federal funds" the PERK study "acts as an instrumentality of the federal government to carry out the federal program." *United States v. Brown,* 384 F.Supp. 1151, 1159–60, *aff'd on*

ty. (Transcript, hearing of March 31, 1983, at 42–43).

*this issue* 557 F.2d 541, 559 (6th Cir.1977). This court does not deny that the NEI, for instance, does not itself have the facilities or the manpower directly to undertake and complete all vision research that it deems to be in the public interest. Yet, even though the relevant provisions of 42 U.S.C. § 241 *et seq.* do indicate that private persons and institutions play a substantial role in the collection and evaluation of public health information, these provisions and their attendant regulations do not clearly outline particular federal programs or policies that are to be, or that can be, carried out only by non-governmental entities. A tremendous amount of control and discretion is left in the hands of the private recipients of NEI funds, who themselves define, as did the ‧PERK defendants here, the parameters of their own research endeavors.

■ In the absence of a clearly articulated federal statutory policy whose enforcement would be frustrated or undercut by a failure to immunize the PERK defendants' conduct here, this court finds the PERK defendants' "instrumentality" theory of immunity unpersuasive in this case. The indisputably broad national goal of "improving the public health" is simply not a concept of sufficient specificity to enable this court to pinpoint particular events or types of conduct that would violate or inhibit the effective functioning of that policy; and yet such a bright line is, almost by definition, an essential component of a federally created scheme of behavior in which certain private conduct is treated as "government conduct" and thereby immunized. This court cannot assume, from the failure of the relevant statutes and regulations to

spell out in detail that private conduct which is to be judicially recognized as "government action," that *all* acts of *all* medical researchers receiving federal grant money are immune from suit. Instead, because this court can find no Congressional intent to immunize *any* such private behavior, this court concludes that mere participation by the PERK defendants in the PERK study is not conduct immune from federal antitrust prosecution.

If anything, the available evidence indicates Congress's hope that applicants for and recipients of federal grants would retain their "private," "non-government" status to the greatest possible extent. In fact, federal agencies or institutions are specifically prohibited from applying for a grant award unless they are specifically authorized by law to receive one. 42 C.F.R. § 52.3. Proposals for grant money are generated exclusively by the private applicants, who must also provide the Secretary of Health and Human Services with a description of the purpose and plan of their project, along with other relevant information. 42 C.F.R. § 52.4. Thus, as to those projects that are ultimately funded, the Secretary simply approves and finances proposals the details of which have been formulated in the private sector. In this capacity, the National Eye Institute when it funds a vision research project is acting precisely like the Ford Foundation would when funding an identical project. The Secretary's acceptance of the PERK plan as one worthy of financial support does not constitute the sort of governmental policy-making activity that can be protected inviolate only by insulating the private PERK defendants from lawsuits.[21]

---

**21.** For similar reasons, the PERK defendants' contention that their actions are immune from antitrust liability under the so-called *"Noerr-Pennington* doctrine" is seemingly unavailing. That doctrine was first created to protect efforts to influence legislative and executive action. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The doctrine has since been extended to cover attempts to influence judicial and administrative actions as well. *California Motor Transport Co. v. Truck-*

*ing Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Because this principle is rooted in the First Amendment protection of one's right to petition the government, all such conduct, regardless of its anticompetitive effects or motivation, is immunized from antitrust liability.

As the Fifth Circuit has recently noted, however, "the crux of the *Noerr-Pennington* immunity is the need to protect efforts directed to government officials *for the purpose of seeking redress.* The doctrine has been applied only to situations involving direct actions made to in-

That the federal government has tried to separate itself from its federally funded private researchers is further illustrated by the "debarment" procedures outlined in 45 C.F.R. part 76. Debarment, which temporarily suspends the financial relationship between the government and the grant recipients, "is invoked to exclude institutions and individuals from participation in [Department of] HHS discretionary programs of financial assistance *to protect the interests of the government*." 45 C.F.R. § 76.1 (Emphasis added). Moreover, 45 C.F.R. § 76.10 provides that

"Subject to the conditions set forth in section 76.11 and the procedural requirements set forth in Sections 76.14 and 76.15, the Secretary may debar an institu-

tion or an individual, and any affiliate thereof in the public interest for any of the following causes . . . (c) conviction under the Federal Antitrust Statutes arising out of the submission of bids, applications or proposals."

It could not be more clear, especially in the absence of any evidence to the contrary, that the government views its own interests as separate and distinct from those of its grant recipients, and that grant applicants and recipients are private entities whose tie to a federal "money supply" does not alter their otherwise unquestioned amenability to a lawsuit arising from behavior undertaken in connection with or pursuant to the grant.[22]

fluence *governmental decision making* [citations omitted]." *Mid-Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 615 F.2d 1372, 1382 (5th Cir.1980) (emphasis added). The decision by the National Eye Institute to financially underwrite the PERK study hardly constitutes the type of governmental decision making and policymaking that the *Noerr-Pennington* doctrine was designed to protect; it is thus unlikely that the collaborative efforts of the PERK defendants in obtaining the PERK grant money and in acting pursuant to the PERK protocol is covered by *Noerr-Pennington* immunity.

**22.** The 1960 amendment to 42 U.S.C. § 241 gave the Surgeon General (now the Secretary of the Department of Health and Human Services) the power to authorize grants-in-aid to public and private institutions in order "to strengthen *their* programs of research and research training in sciences related to health." H.R. 10341, 1960 U.S.Code Cong.Ad.News at 3845 (emphasis added). The purpose and proposed functions of this new legislation were outlined by then-Secretary of HEW Arthur Flemming in the report of his Department that was tendered, along with the draft bill, to the House of Representatives on January 27, 1960. He described the need to move away from federal funding of individual research projects, and toward a system of support for institutionally-sponsored investigations, as follows:

In large part the support of research exclusively through the project system has deprived educational institutions of a large measure of autonomy and freedom in determining the character and direction of their research activities. Furthermore, exclusive reliance upon the project system does not make it possible for educational institutions to assume a position of responsibility in carrying out their role in the conduct of

medical and health-related research supported through Federal funds.
Thus, a new and important set of problems now confronts the Federal administration of medical research. These problems surround the basic question of how to provide Federal support in a manner which not only assures the full productivity of individual investigator through the best terms and conditions of project support, but also places the universities and medical schools, and other institutions within which the investigators work, in a more effective and a more responsible position to develop and guide the research and research training programs which are an essential part of their function in a manner consonant with the institution's overall and long-range objectives.
This need is clearly set forth in the report of the Secretary's Consultants on Medical Research and Education (the Bayne-Jones report) which states that:

"An increase in the capacity of research and educational institutions to perform their educational and research functions more effectively would be in the national interest. To this end, Federal funds for research should be provided under conditions which give the institutions a substantial degree of freedom in deciding how to use the funds. *The essential function of such funds is to foster freedom and responsibility in the institutions.*
Reprinted in 1960 U.S.Code Cong.Ad.News 3848–9 (emphasis added).
The emphasis on institutional integrity and autonomy underlying this grant system is obvious. The PERK defendants' suggestion that their federally funded research project is a government undertaking is thus clearly inconsistent with the ideological underpinnings of those federal grants administered pursuant to 42 U.S.C. § 241.

In light of the foregoing, this court finds the cases cited by the PERK defendants in support of their immunity argument somewhat inapposite. In particular, their reliance upon *Alabama Power Company v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672 (5th Cir.1968), and upon *Medical Association of Alabama v. Schweiker,* 554 F.Supp. 955 (M.D.Ala.1983), is misplaced. Both of these cases involved a conflict between the antitrust laws on the one hand, and a federal *regulatory* scheme on the other. Clearly present in both cases was a Congressional intent to replace, to some extent, a free market system of competition with a system of regulation, so as deliberately to reduce, in the name of the public interest, certain "negative" effects of competition within a particular industry. Thus, in *Alabama Power,* the court rejected the plaintiff's attempt to use federal antitrust laws to prevent the Rural Electrification Administration from making a loan to the Alabama Electric Cooperative. The Fifth Circuit found that rural electric cooperatives were "chosen by Congress *for the purpose of bringing abundant, low cost electric energy to rural America" Alabama Power,* 394 F.2d at 676–77, (emphasis added), and therefore, "to avoid frustrating the intent of Congress, it must follow that in cases where the Administrator [of the REA] is immune from suit under the antitrust laws, the [private] borrower [AEC] is likewise immune." *Id.*

Similarly, in *Medical Association of Alabama,* Congress expressly authorized financial assistance, and hence a competitive edge, to rural health centers created pursuant to the Public Health Service Act, 42 U.S.C. § 201 *et seq.,* and its administratively-established Rural Health Initiative Program. This was done "in order to increase the availability of and access to primary health services for residents of medically underserved areas," *Id.,* 554 F.Supp. at 958. The PERK defendants, of course, focus this court's attention upon the holding of that case with respect to the plaintiffs' antitrust claims. The court found that the private rural health centers were themselves immune from antitrust liability because "it

appears that [their] actions . . . were wholly at the direction and with the consent of the federal defendants" as to whom an official immunity was found to attach. *Id.* at 966. It bears repeating, however, that the court based its holding in that case on a clearly expressed *congressional* intent to regulate competition in the rural health care delivery market; the court premised its conclusion that the rural health center was a federal "instrumentality" on the fact that it was set up and operated pursuant to a federal *program* expressly motivated by that goal. Once again, this court has found no persuasive evidence suggesting that in authorizing the National Eye Institute to fund vision research, Congress intended to regulate competition in the ophthalmology field. Accordingly, the PERK defendants' motion for summary judgment on the issue of governmental immunity is DENIED.

*Venue*

The plaintiffs argue vehemently that the Northern District of Georgia is the proper venue for this lawsuit, contending that "in an anti-trust conspiracy involving many defendants, it is hardly conceivable that all the defendants, residing or doing business in different states, will be happy with the plaintiff's choice of forum. Nor can the plaintiff, with any degree of practicality, pursue two or more actions involving severed defendants on the same alleged conspiracy. A balance of convenience must be found." *Iranian Shipping Lines, S.A. v. Moraites,* 377 F.Supp. 644, 647 (S.D.N.Y. 1974). While at first glance this statement has some logical appeal, the plaintiffs overlook the extent to which the "co-conspirator" theory of venue, first enunciated in *Giusti v. Pyrotechnic Industries,* 156 F.2d 351 (9th Cir.), *cert. denied* 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675 (1946), has been discredited. The plaintiffs have simply failed to show the requisite nexus between the Northern District of Georgia and many of those defendants moving for dismissal from this case.

■ While the relationship between the special venue provisions of 15 U.S.C. § 15

and the general venue provisions of 28 U.S.C. § 1391(b) is not wholly clear, the better and more widely accepted view seems to be that in private antitrust actions, § 1391 supplements § 15, in order to facilitate prosecution of these actions by broadening the choice of available forum. *See, e.g., Albert Levine Associates v. Bertoni and Cotti,* 314 F.Supp. 169 (S.D.N.Y. 1970); *U.S. Dental Institute v. American Association of Orthodontists,* 396 F.Supp. 565 (N.D.Ill.1975); *Compare, Manufacturers Buyers Corp. v. El Dorado Tire Co.,* 324 F.Supp. 225 (S.D.Fla.1971). The plaintiffs have conceded, however, that 15 U.S.C. § 15, authorizing an antitrust suit "in any district court of the United States in the district in which the defendant resides or is found or has an agent ...," does not provide venue in the instant case. (*See,* Plaintiff's Brief in Response to Federal Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, at 14). The plaintiffs thus rely solely on 28 U.S.C. § 1391(b) to establish venue.

Section 1391(b) provides that

"A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law."

Given that there is not one judicial district "where all defendants reside," the plaintiffs hope to demonstrate that the "claim arose" in the Northern District of Georgia, and thus that venue is properly laid here. Again, there is a split of authority concerning the standard to be used in determining "where the claim arose." Perhaps the most popular, and the most relevant, places venue where the contacts weigh most heavily. *Philadelphia Housing Authority v. American Radiator and Standards Sanitary Corp.,* 291 F.Supp. 252, 260 (E.D.Pa.1968). This test does not, however, dispense with the plaintiffs' obligation to "establish venue as to each defendant separately." *Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority,* 475 F.Supp. 711, 715 (D.D.C.1979). *See also,* 15 Wright, Miller and Cooper, *Federal Practice and Proce-*

*dure* § 3818, at 116 (1976). As the court stated in *ABC Great States, Inc. v. Globe Ticket Co.,* 310 F.Supp. 739, 743 (N.D.Ill. 1970), "the inquiry ... does not end" when a court concludes that the weight of the contacts rests in a particular district, because "venue as to each defendant must [still] be established independently." Similarly, in *Farmer's Bank of the State of Delaware v. Bell Mortgage Corp.,* 452 F.Supp. 1278 (D.Del.1978), the court acknowledged that "before the Court [can] determine the 'weight of the contacts,' " the plaintiff must allege that "each participant in the conspiracy, as to whom the impropriety of venue in a particular district is asserted, has engaged in some *significant or substantial act pursuant to the conspiracy in that district." Id.* at 1281 (emphasis added).

Thus, assuming *arguendo* that the "weight of the contacts" rests in the Northern District of Georgia, and that this district is in fact "where the claim arose," this court must still satisfy itself that each defendant in this lawsuit committed overt acts pursuant to a conspiracy in this district, in order to find that venue is properly laid here. The plaintiffs have the burden of placing before this court evidence suggesting the defendants' performance of conspiratorial acts within the Northern District of Georgia. *Call Carl, Inc. v. BP Oil Corporation,* 391 F.Supp. 367 (D.Md.1975). And yet, as to several groups of defendants, the plaintiffs allege and prove no such facts. Instead, the plaintiffs impute to these defendants the knowledge and conduct of other defendants who arguably did commit conspiratorial acts in this district.

■ Specifically, the plaintiffs contend that those PERK study participants who did not attend the March 1980 Atlanta Airport meeting have demonstrated their complicity in the alleged conspiracy merely "by their active participation in PERK." (*See,* Plaintiffs' Second Supplemental Brief at 24). Yet, many courts have consistently concluded that the actions of an alleged co-conspirator within a particular district

cannot support venue with respect to a defendant who did not personally engage in conduct within the district. Similarly, conspiratorial meetings within a district are insufficient to establish venue as to defendants who did not themselves attend the meetings. *See, e.g., Javelin Corp. v. Uniroyal, Inc.,* 360 F.Supp. 251 (N.D.Cal.1973); *Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority,* 475 F.Supp. 711 (D.D.C.1979); *Piedmont Label Co. v. Sun Garden Packing Co.,* 598 F.2d 491 (9th Cir.1979); *Illinois v. Harper & Row Publishers, Inc.,* 308 F.Supp. 1207 (N.D.Ill.1969); *See also, Bankers Life and Casualty Co. v. Holland,* 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106 (1953). Accordingly, this court finds that venue in this court is improper as to defendants Villasenor, Schanzlin, Smith, and Salz (the "University of Southern California defendants"); defendants McPherson, Bettman, Blodi, Newell, Reisecke, Shoch, Spivey and Fred M. Wilson Sr. (the "American Academy of Ophthalmology defendants"); and defendants Balyeat, Laibson, Safir, Doughman, Lindstrom and Baum.

None of these defendants attended the Atlanta Airport meeting, and none appears to have performed *any* act in the Northern District of Georgia that is in any way connected with this case, must less an act of the "substantial" or "significant" dimension required in order to make venue in this district appropriate as to them. Defendants Villasenor, Schanzlin, Smith and Salz, for instance, are all physicians affiliated to some degree with the University of Southern California ("USC") School of Medicine. Drs. Schanzlin and Smith carry out preoperative and postoperative examinations on PERK study patients; and Drs. Villasenor and Salz performed three and four radial keratotomy operations, respectively, in the pilot phase of the PERK study at U.S.C. All of their actions were carried out in California, in strict compliance with PERK protocol.

A slightly different but equally tenuous case is presented against Drs. McPherson, Bettman, Blodi, Newell, Reinecke, Schoch, Spivey and Fred M. Wilson Sr. These defendants have been sued in their individual capacities for actions allegedly undertaken as members of the Board of Directors of the American Academy of Ophthalmology ("AAO"). The only wrongful acts that the AAO defendants are alleged to have committed involve (1) their endorsement, in June and July of 1980, of the National Advisory Eye Council resolution declaring radial keratotomy to be experimental, and (2) attempting to monopolize radial keratotomy services in the cities in which they reside. While making no comment on the merits of these contentions, this court notes that none of these actions took place in Georgia, and that the plaintiffs have alleged no conduct undertaken by these defendants in Georgia.

Dr. Hal Balyeat is a physician at the McGee Eye Institute, Department of Ophthalmology, at the University of Oklahoma in Oklahoma City. He has performed radial keratotomy surgery both within the PERK Study and on private patients outside the study. Again, none of this conduct, and no other relevant acts by Dr. Balyeat of which this court is aware, was performed in Georgia.

Dr. Peter Laibson is an ophthalmologist in private practice in Philadelphia, Pennsylvania, and was an Investigator in the PERK Study at the Wills Eye Hospital in Philadelphia. All of his work in connection with the PERK study was carried out in Pennsylvania. It does appear that he had telephonic communication with Dr. Waring and other PERK participants in a conference call held on September 9, 1981 (*See* plaintiff's exhibits 9, 10 attached to Stipulation Regarding Documents Produced by Dr. Waring), during which various aspects of the PERK study were discussed. This alone, however, does not constitute an overt act in Georgia in furtherance of a conspiracy sufficient for this court to find venue properly laid as to Dr. Laibson.

Similarly, the only contact with Georgia that is alleged against Dr. Aran Safir is participation in this September 9, 1981 telephone call. At the time this lawsuit was

filed, Dr. Safir was a Professor of Ophthalmology at Louisiana State University Medical Center; Dr. Safin is currently the Chief of the Department of Ophthalmology at the University of Connecticut School of Medicine. While at LSU, Dr. Safir participated in the PERK study, but is no longer a participant, as the University of Connecticut is not a PERK center. Once again, there is no evidence of any "conspiratorial" action taken by Dr. Safir in Georgia.

Dr. Richard L. Lindstrom and Donald J. Doughman are physicians affiliated with the University of Minnesota School of Medicine. Dr. Lindstrom actually performed radial keratotomy surgery in connection with the PERK Study, while Dr. Doughman participated in the PERK study solely as an examiner in the research project. Neither defendant has undertaken any conduct related to this case within the State of Georgia.

Finally, Dr. Jules Baum is an ophthalmic surgeon affiliated with Tufts University Medical School in Massachusetts. He and Tufts University applied to the National Eye Institute for a PERK Study grant, and this application was rejected. Subsequently, he was asked to participate in the PERK study as a member of the Data and Safety Monitoring Board. His job involved making sure that the PERK surgeons were complying with the PERK protocol, and will also eventually involve evaluation of the data gathered by PERK surgeons. Beyond this participation in the PERK study, Dr. Baum appears to have engaged in absolutely no conduct in this district relevant to this lawsuit that would subject him to venue in this court.

All of the foregoing defendants, with the exception of the defendants named in their capacities as directors of the American Academy of Ophthalmology, have been brought into this lawsuit because of their participation in a study whose "nerve center" and coordinating physicians were located in this district. That Drs. Waring, Cavanagh and Louis Wilson, as to whom venue in this court is clearly proper, may be suspected of having organized and fueled a conspiracy to control the performance of radial keratotomy, does not alone justify venue in this court as to some of their co-participants in the PERK study. Were this court to hold otherwise, this court would be embracing the now-thoroughly discredited "co-conspirator theory" of venue, and would be relieving the plaintiffs of their obligation to allege facts to support venue as to each defendant independently. Mere allegations of complicity based on "knowledge" and "intent," without any supporting factual evidence, are simply insufficient to support venue in this court as to the defendants discussed above. Accordingly, the lawsuit is DISMISSED for lack of venue as to those defendants.

Quite a different result obtains, with respect to venue, as to defendants Rowsey, Gelender, Obstbaum, Aquavella, Krachmer, Sugar, Thoft, and Keates. These physicians all attended the Atlanta Airport meeting in March 1980, at which the alleged conspiracy was purportedly born. If in fact a conspiracy is ultimately found, it does appear that this meeting, led by defendant Waring, will be deemed a significant event. On a threshold motion involving venue, this court cannot, and indeed should not, make a determination regarding the merits that must be reserved for the factfinder once all discovery has terminated. This court need not, therefore, find at this time that the defendants attending this meeting in fact knowingly participated in a conspiracy. Rather, because the plaintiff has successfully alleged that these defendants had substantial or significant contacts with this district in connection with the claimed conspiracy, in the form of their attendance at this meeting, the motions by these defendants to dismiss for improper venue is DENIED.

*Personal Jurisdiction*

Having decided that venue in this court is proper as to defendants Rowsey, Gelender, Obstbaum, Aquavella, Krachmer, Sugar, Thoft, and Keates, it is necessary for this court to examine whether personal jurisdiction may be obtained over these non-

resident defendants.[23] When this court's subject matter jurisdiction is predicated, as it is in the instant case, upon the presence of a federal question as opposed to diversity of citizenship among the parties, a nonresident defendant's amenability to personal jurisdiction is a question of federal rather than state law. *Terry v. Raymond International, Inc.,* 658 F.2d 398, 402 (5th Cir.1981). In such cases, the otherwise threshold inquiry of whether the forum state's "long-arm" statute provides personal jurisdiction over these defendants is essentially irrelevant. *Lapeyrouse v. Texaco, Inc.,* 693 F.2d 581, 585 (5th Cir.1982).[24] "In undertaking, then, to apply the sole test of amenability to jurisdiction in a federal question case, the test of constitutionality, we begin by noting that the appropriate inquiry lies with the due process of laws clause of the Fifth Amendment. While the limitations imposed in the Fifth Amendment are similar to those imposed upon the state courts under the Fourteenth Amendment, they are not necessarily identical." *Id.*

■ It is clearly established that when a challenge is made to this court's personal jurisdiction over a defendant, the initial burden of proof on this issue rests upon the plaintiff. 6 Wright and Miller, *Federal Practice and Procedure* § 1351 at 565; *Southwest Offset Inc. v. Hudco Publishing Company, Inc.,* 622 F.2d 149 (5th Cir.1980). All pleadings and affidavits in-

troducing evidence relating to jurisdictional facts are to be construed in the light most favorable to the plaintiff. *Atlantic Lines, Ltd. v. M/V Domburgh,* 473 F.Supp. 700 (S.D.Fla.1979); *Wessel Co. v. Yoffee & Beitman Management Corp.,* 457 F.Supp. 939 (N.D.Ill.1978). In addition, when, as in this case, a decision on the jurisdictional dispute also embraces questions of ultimate liability, and when the determination of the jurisdictional facts is intertwined with and potentially dispositive of the merits of the lawsuit, the plaintiff need only show "threshold" or *prima facie* jurisdiction when the defendant challenges personal jurisdiction. *Gemini Enterprises, Inc. v. WFMY Television Corp.,* 470 F.Supp. 559, 565 n. 4 (M.D.N.C.1979); *McLaughlin v. Copeland,* 435 F.Supp. 513 (D.Md.1977); *Holfield v. Power Chemical Co., Inc.,* 382 F.Supp. 388 (D.Md.1970).

■ This relaxed burden of proof with respect to jurisdictional facts "applies to the conspiracy theory of jurisdiction when the defendant's ultimate liability may depend upon the existence of the alleged conspiracy." *Gemini Enterprises, supra,* 470 F.Supp. at 565 n. 4. This court's task, then, is to determine whether the plaintiff has made a *prima facie* showing of personal jurisdiction over the nonresident defendants within the framework of the factors "relevant to a determination of the fairness of

---

**23.** This court's finding that venue was improper as to the eighteen defendants discussed in the preceding section makes it unnecessary for this court to discuss their amenability to *in personam* jurisdiction in the Northern District of Georgia. This court is of the impression, however, that each of those defendants lacked *any* relevant contact with the state of Georgia, much less an amount of contact sufficient for this court to deem its exercise of personal jurisdiction over them consistent with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

**24.** Even though federal law governs the issue of amenability to personal jurisdiction, service of process must be made in accordance with applicable state law if the federal statute giving rise to federal question jurisdiction does not provide for nationwide service of process. *See,* Rules 4(d)(7), 4(e), F.R.Civ.P. This court has

discovered no federal statute authorizing extraterritorial service of process upon an individual nonresident defendant in a private antitrust action; 15 U.S.C. §§ 6 and 25 authorize such service only in antitrust suits brought by the U.S. government, and 15 U.S.C. § 22 permits such service only in the context of antitrust suits brought against corporations. *Athlete's Foot of Delaware v. Ralph Libonati Co.,* 445 F.Supp. 35, 48 (D.Del.1977). Accordingly, service of process upon the remaining nonresident defendants in this case must have been in accordance with the relevant Georgia statute.

With the exception of defendant Dr. Steven Obstbaum, as to whom service apparently was initially improperly made and subsequently perfected, there appear to be no disputes as to the manner in which service was made upon the nonresident defendants in question; the court will thus refrain from discussing this matter further.

exerting jurisdiction ... in the context of a federal forum interpreting its own laws." *Lapeyrouse, supra,* 693 F.2d at 586. This court must thus "give weight to the differences occasioned by the federal nature of both the forum and the claim in determining whether the due process clause of the Fifth Amendment permits exercise of *in personam* jurisdiction in this case." *Id.*

In order to justify personal jurisdiction over these nonresident defendants, this court must find that each individual had "minimum contacts" with the state of Georgia, sufficient to comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). The relationship between each nonresident defendant and the forum must be such that it is "reasonable ... to require the [defendant] to defend the particular suit which is brought there." *Id.* at 316, 66 S.Ct. at 158. While the burden on the defendant of litigating in a distant forum is always a "primary concern" in the minimum contacts analysis, *see, e.g., World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980), that factor will be evaluated in light of other relevant considerations, including the appellants' interest in maintaining the lawsuit in a forum that can provide "convenient and effective relief." *Id.* at 292, 100 S.Ct. at 564.[25] All of the plaintiffs in this case except for Dr. Leo Bores are Georgia residents; the headquarters of the PERK study, as well as the so-called "nerve center" of the alleged conspiracy, are in Georgia. There is certainly no other forum in which to obtain a more "efficient resolution of [this] controvers[y]." *Id.* Of course, personal jurisdiction cannot

be obtained merely because a defendant has had *some* contact with the forum state; this court must affirmatively find that the plaintiff's cause of action against that defendant "arises out of, or results from, the purposeful activity of the defendant involving [the] state." *National Egg Co. v. Bank Leumi,* 514 F.Supp. 1125, 1128 (N.D.Ga. 1981).

The nonresident defendants who participated in the Atlanta Airport meeting chose to come into the state of Georgia, to some extent "invoking the benefits and protections of its laws," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). It was certainly not completely unforeseeable that these defendants might ultimately be called upon to account in a court of law for the actions they took once they got here. This court is not, on the instant motions to dismiss, permitted to make a final decision as to what, if any, anticompetitive conduct took place at that meeting or resulted from that meeting. Obviously, it is not for this court to decide at the present time that there is or is not a conspiracy to "control" radial keratotomy, or that the persons in attendance at that meeting did or did not have the requisite conspiratorial intent. It is sufficient for this court to find, for purposes of exercising *in personam* jurisdiction over the nonresident defendants, that if such a conspiracy did or does exist, it appears to have had its genesis at a meeting occurring within the state of Georgia. There are outstanding questions of fact as to whether conduct actionable under the antitrust laws took place there, and whether and to what extent a nationwide conspiracy grew out of that meeting. Accordingly, this court finds that defendants Rowsey, Gelender, Obst-

---

**25.** Many of the other factors discussed in *World-Wide Volkswagen Corp. v. Woodson, supra* at 291–93, 100 S.Ct. at 564–65, are not tremendously relevant to the instant case, inasmuch as they relate specifically to issues of state sovereignty not present here. In cases involving a *state* court's extraterritorial exercise of *in personam* jurisdiction, the Due Process Clause of the Fourteenth Amendment acts "as an instrument of interstate federalism," *Id.* at 294, 100 S.Ct. at 565, and thus ensures "that

the states, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 292, 100 S.Ct. at 564. In the case at bar, however, there is a substantial federal interest inherent in uniform enforcement of federal antitrust laws and policies which negates the limitations traditionally associated with a court's exercise of personal jurisdiction over nonresident defendants.

baum, Aquabella, Krachmer, Sugar, Thoft and Keates are amenable to personal jurisdiction in the Northern District of Georgia, and their motions to dismiss are thus DENIED.

In sum, the Motion to Dismiss or for Summary Judgment by defendants Kupfer, Geller, Kaufman and Norton is GRANTED; the PERK defendants' Motion for Summary Judgment is DENIED; and the Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue by defendants Villasenor, Smith, Schanzlin, Salz, McPherson, Bettman, Blodi, Newell, Reinecke, Schoch, Spivey, Fred Wilson, Balyeat, Laibson, Lindstrom, Doughman, Safir and Baum are GRANTED. Remaining as defendants in this case are Drs. Waring, Cavanagh, Louis Wilson, Rowsey, Gelender, Obstbaum, Aquavella, Krachmer, Sugar, Thoft and Keates.